(No. 14258.—Decree affirmed.)

JOHN H. MILLER *vs.* H. H. CLARK *et al.* Appellees.— (CHARLES MILLER, Admr. *et al.* Appellants.)

*Opinion filed December 22, 1921—Rehearing denied Feb. 10, 1922.*

1. PARTIES—*parties interested in subject matter of a suit may intervene on motion.* By the general principles of equity and by virtue of section 1 of the statute of amendments and jeofails, giving the court authority in all proceedings to permit amendments in form and substance for the furtherance of justice, persons substantially interested in the subject matter of a suit may intervene on oral motion to be made parties and may be permitted to file an answer setting up their interests.

2. PLEADING—*when answer may be amended to set up Statute of Frauds.* After a hearing before the master but before the master's report is filed or any order or decree is entered with reference to the final decision or disposition of the proceeding by the trial court, parties who have been permitted to file an answer to a bill for specific performance may be allowed to amend their answer so as to set up the Statute of Frauds.

3. SPECIFIC PERFORMANCE—*specific performance is not granted as a matter of right.* Even where the terms of a contract are clear, certain and unambiguous, specific performance is not a matter of right but rests in the sound discretion of the court, to be determined from all the facts and circumstances of each case.

4. SAME—*when specific performance is properly denied.* The proposed purchaser of a lot, who with knowledge that the description in the contract has been changed continues his payments without seeking to have the description changed back, is not entitled to specific performance as to the lot first described, which has been since purchased and permanently improved by innocent third parties having no notice, actual or constructive, of any adverse claim to such lot.

APPEAL from the Circuit Court of Madison county; the Hon. J. F. GILLHAM, Judge, presiding.

R. F. TUNNELL, JR., for appellants.

WARNOCK, WILLIAMSON & BURROUGHS, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by John H. Miller against appellee H. H. Clark for the specific performance of an alleged contract for the sale of lots in Madison county. A default was entered against Clark and the cause was referred to a master in chancery, but the order of reference was later set aside and an intervening petition allowed to be filed making appellees F. W. Davis and the Home Building and Loan Association of Edwardsville, Illinois, parties. The intervening petition was withdrawn and the last two named parties by leave filed an answer, which denied Clark's authority, under the alleged contract of sale with Miller, to convey the two lots, and alleged that a deed had been made to the lots, without notice of Miller's alleged contract, to Davis and H. A. Anderson, who had built lasting improvements on said lots. By an amended answer Davis and Anderson also set up the Statute of Frauds as a defense. The matter was thereafter referred to a special master in chancery for hearing, the bill as to Clark being taken as confessed. The master's report recommended a decree for specific performance of the contract under certain conditions, but the chancellor thereafter sustained exceptions filed by appellees to the report and dismissed the bill for want of equity, and the cause is now here on appeal by the administrator and heirs-at-law of Miller, who has died.

Under the allegations of the bill and the evidence on the hearing it appears that the lots described in the bill of complaint are located in what is known as the Roxana subdivision, in Madison county, at or near Wood River; that at the time the subdivision was platted the property was, in fact, owned by H. F. Bowman, of Alton, Illinois; that Bowman, before platting the same, caused the title to be

conveyed to Clark as trustee, Clark living in Wood River and being the cashier of the First State and Savings Bank there; that as the subdivision was located nearer to Wood River than to Alton it was thought the property could be more conveniently handled by Clark than if the papers as to each transaction had to be signed by the real owner, Bowman. After the property was platted in the Roxana subdivision Bowman employed Davis to take charge of the subdivision and sell the lots therein, it being arranged that when the lots were sold for cash the purchase money was to be paid to Clark and the description of the lot sold reported to him, whereupon he was to execute a deed therefor and give it to Davis, who was to deliver it to the purchaser; that when lots were sold on the installment plan a time-payment contract was executed in triplicate, one of which was to be given to the purchaser, one to Clark to be retained by him in the bank for future reference, and the other to be retained by Davis in his office. It further appears that about August 24, 1917, E. G. James, one of Davis' salesmen, took Miller, his brother and two of his neighbors to the Roxana subdivision and showed them over the property; that during this visit to the subdivision a sale was attempted to be made to Miller by James of two lots in the subdivision, the property being described, as claimed by appellants, as lots 5 and 6 in block 5 in said subdivision, and Miller paid $180 in cash to James as full payment for one lot, which appellants claim was lot 6 in block 5, and thereafter James issued to Miller a receipt reading as follows:

"Amt. Paid, $180.                              Date, 8/24, 1917.

"Received of J. H. Miller one hundred eighty dollars as first payment on lot No. 6, block No. 5, Altwood subdivision, East Alton, Madison county, Ill. Purchase price to be 180 dollars.

"This receipt must be presented at the office of F. W. Davis, sales manager, and exchanged for regular contract. All sales subject to approval of sales manager. Payment in full.

E. G. JAMES, *Salesman.*"

The above receipt was on a printed blank which had been prepared for use as to lots in the Altwood addition and had apparently been changed by James to meet the requirements of the sale of the lots in the Roxana subdivision to Miller, except that "Altwood" was not changed to "Roxana." On the same day this transaction was entered into, Miller, for himself, or, as some of the evidence tends to show, for his mother, paid $14, presumably as part payment on lot 5 in block 5. At the same time James executed and delivered to Miller a contract which as originally written, as asserted by counsel for appellants, was for lot 5 in block 5. This contract was not signed by Clark in any way, either as an individual or as trustee, or by anyone authorized by him to sign the same in his name. It appears to have been prepared on a printed form on which the name "H. H. Clark, Trustee," was printed. Davis' signature to this contract under Clark's name appears to have been written by James for Davis, although there is nothing in the record to show that James had authority to act in any way for Clark in the sale of these lots, and in connection with this sale he appears to have been unknown to Clark. This contract was executed in triplicate, two of the copies being delivered by James to Davis and the other copy being given to Miller. It would appear that when the report as to the sale of lot 6 was made to Davis by his salesman, James, it was unintentionally reported as lot 6 in block 4 instead of lot 6 in block 5, and thereupon Davis procured from Clark and wife a warranty deed to Miller for lot 6 in block 4, which he mailed either to Miller, or to his mother for him, at Glen Carbon, Illinois. Miller was not married and resided with his mother, Isabelle Miller. This deed has at all times since been retained by Miller and his heirs, and was at the time of the trial, and is now, in their possession, and it has never been returned to Clark or Davis, and the evidence tends to show that no one for

appellants ever offered to return it, and although complaint was made to Clark that the description in the deed was erroneous, there never was any demand made by or on behalf of Miller or his heirs for the return of the $180 cash payment.

It further appears that when Davis discovered that Miller had been given a deed to one lot in block 4 and had also been given a contract to another lot in block 5, he sent James to Miller's home at Glen Carbon to make some arrangement to put the two lots together in the same block. When James called at the Miller residence he found Miller absent but Mrs. Miller was in, and he explained the situation to her and they found the contract for the lot. Without any objection on the part of Mrs. Miller, and, it would seem, with her consent, James changed the block number in the contract so that after being changed it called for lot 5 in block 4 in the Roxana subdivision, which would place lot 5 immediately adjoining lot 6 in block 4, described by the deed delivered to Miller. This change as to block number was made in all three copies of the contract. Miller's copy, which was pasted in a pass-book, was left with Mrs. Miller and the remaining copies returned to Davis, who retained one copy in his office and delivered one copy, as changed, to Clark, who thereupon made a record of the sale in his books as to lot 5 being located in block 4 in said subdivision. The evidence also shows that upon her son returning home shortly after James' visit Mrs. Miller notified him of the change made in the contract as just described. It would appear from the evidence that after the contract was so changed, Miller, or someone for him, made payments on it to Clark at the Wood River bank from time to time, which payments were generally made through the mail, the pass-book being sent with each payment and returned to Miller after the payments were credited therein; that at none of the times when such payments were made did Miller, or anyone for him, notify Clark or Davis or anyone

at the bank that he claimed the contract to cover lot 5 in block 5 instead of lot 5 in block 4. The evidence tends to show that at the time the sale was made of the lots in the Roxana subdivision it was the purpose of Davis to sell the lots in pairs, and the evidence on the part of appellees tends strongly to show that at the time of Miller's purchase, lots 5 and 6 in block 4 and lots 5 and 6 in block 5 were of the same size and practically the same value, although there is some contention on appellants' part that as block 5 was nearer to the business district and has a sidewalk, lots in block 5 were better situated and worth more than those in block 4.

On November 7, 1917, after the arrangement for the sale of the two lots in the Roxana subdivision heretofore referred to, Clark, apparently without any notice that Miller claimed any interest in lots 5 and 6 in block 5 of said subdivision, conveyed the two lots to Davis and Anderson. It is apparent that at that time Anderson had no notice whatever of Miller's making any claim of any interest in lots 5 and 6 in block 5. While it is contended by counsel for appellants that Davis must have had notice, because of his connection with the sale of these lots, of Miller's claim, there is no positive proof that Davis at the time of the sale of lots 5 and 6 in block 5 to himself and Anderson, in November, 1917, had direct attention called to the fact that Miller still claimed an interest in said two lots in block 5. It would appear that nothing at that time had been filed of record to show that Miller claimed any interest in the lots in block 5. Thereafter Davis and Anderson in the fall and winter of 1917 erected a four-room residence mostly on lot 5 in block 5 but extending over onto lot 4 in block 5. There is no dispute in the record as to the ownership of lot 4 and no further reference to that fact need be made. On April 3, 1918, Davis and Anderson borrowed from the Home Building and Loan Association $800, giving their promissory note for that amount secured by a

mortgage to the association on lot 5 and other property in block 5, which mortgage and note at the time of the hearing in this proceeding remained due and unpaid. It would also appear from the record that neither Miller, nor anyone for or claiming under him, ever had possession of lots 5 and 6 in block 5, or either of them; that at the time of making this loan on lot 5 in block 5 the valuation committee of the building and loan association visited and inspected the property and found no one in possession, and at that time an abstract was furnished to the association by Clark showing that the record title to lot 5 in block 5 was in Clark, trustee, Davis and Anderson not having yet recorded their deed; that it then appeared that the deed from Clark to them of lots 5 and 6 in block 5 had been mislaid, and Clark issued to them a duplicate deed conveying the same premises, which was recorded and the title perfected in Davis and Anderson at the time this loan was made. Thereafter Anderson quit-claimed his interest in lot 5 to Davis on September 6, 1918. Later, in December, 1918, Davis rented the house on said lots to Cora Anderson, who lived there from that date to May, 1920. The record shows she found no one in possession when she rented the property, and neither Miller nor anyone for or claiming under him ever visited the property while she resided there or made any claim concerning it prior to April, 1920. The record also shows that when the final payment was made on the contract as changed by James, for lot 5 in block 4, in August, 1918, Clark offered Miller or his heirs to convey lot 5 in block 4 in said subdivision and has ever since been ready to convey the property to Miller or his representatives. It also appears from the record that at the time the summons was served in this case on Clark, he having no beneficial interest in the property, referred the same to the beneficial owner, Bowman, and for some reason not disclosed by the evidence, Bowman apparently overlooked the matter of filing an answer for Clark in these proceedings, and there-

upon default was taken. Davis was at that time in Miami, Florida, and remainded there for some time afterwards.

On July 8, 1920, the order for reference to the master having been set aside, leave was given to file an intervening petition by Davis and the Home Building and Loan Association, in which they set up their rights substantially as heretofore stated, in lots 5 and 6 in block 5. An exception was filed to this petition. On December 1, 1920, an order was entered by the trial court granting leave to Davis and the association to withdraw the intervening petition and to answer the original bill, and in the same order a suggestion was made of the death of Miller and leave given to his administrator and heirs-at-law to be made parties complainant in said original bill. In compliance with this order Davis and the association filed an answer to the original bill, setting out the facts substantially as stated in the intervening petition with reference to the sale of the disputed lots and the proceedings with reference to the same. A replication was thereafter filed to the answer by Miller's administrator, and on January 20, 1921, by leave of court, appellees were granted leave to file an amended answer to the bill of complaint, which contained substantially the same allegations as the original answer, except they added that they relied on the Statute of Frauds as a defense.

The testimony of the witnesses is not in entire accord as to just what efforts were made by John H. Miller before his death, or by those representing him, to have the contract or original deed changed so as to describe the property as two lots in block 5 instead of two lots in block 4 in said subdivision. It does clearly appear, however, that Miller, even after learning of the change in the contract from block 5 to block 4, continued to make payments on the contract, and the evidence on behalf of appellees tends to show that he made no specific attempt to have the change made back until about the time of the last payment on lot 5 in block 4. The testimony is not in entire harmony as to

when appellees learned of the mistake that had been made in describing the property. The evidence tends to show that Davis knew of the dispute as to what lots were sold,— whether in block 4 or block 5,—before these proceedings were started.

Counsel for appellants very earnestly argues that the court erred in permitting appellees F. W. Davis and the Home Building and Loan Association to become parties to the litigation after the bill was filed, they not being made parties in the original proceeding but became parties on motion and filed an intervening petition. The general practice is, that where there is a defect as to parties the court may at any time, before or after trial and before a final judgment or decree is rendered, direct other persons to be made parties, to the end that justice may be done, provided all rights are properly considered and protected. (20 R. C. L. 696.) In *Marsh* v. *Green*, 79 Ill. 385, this court said (p. 387): "As we understand the modern practice, any person feeling that he has an interest in the litigation may apply to the court and be permitted to intervene and become a party and have his rights passed upon on the hearing, and the court will permit him to become such party on a proper showing. He would, of course, not be permitted to intermeddle when he had no substantial interest in the subject matter of the suit." This same doctrine has been approved by this court in *Shannahan* v. *Stevens,* 139 Ill. 428, and *Wightman* v. *Evanston Yaryan Co.* 217 id. 371. The reasoning in 21 Corpus Juris, on pages 341-343, and cases there cited, tends strongly to support this conclusion, and outside of the rules of equity cited in the foregoing authorities on this question, it would seem, under section 1 of our statute on amendments and jeofails, (Hurd's Stat. 1917, p. 58,) that the court would have general authority in all proceedings to permit amendments in form and substance for the furtherance of justice. Davis

and the association, who were permitted to intervene and file an answer in the trial court, were not intermeddlers or interlopers but were greatly interested in the subject matter of the suit. Parties may be allowed to intervene on oral motion, as shown by the reasoning of this court in the cases already cited on this question, and the granting or refusal of such a motion is held to be within the sound discretion of the court. We think a proper construction of our statute on amendments and jeofails, and the reasoning of the decisions of this court, as well as the authorities cited from other jurisdictions, plainly indicate that the court committed no error in permitting Davis and the association to file their amended answer raising the question of the Statute of Frauds, after the hearing had been had but before the master's report was filed or any order or decree of court entered with reference to the final decision or the proceeding finally disposed of by the trial court. The allowing of the amendment to the answer raising this question could not in any way have surprised or misled Miller or his counsel on the trial of the case.

The alleged contract under which the recovery is sought was signed by Miller in August, 1917. He testified that he discovered that the deed was wrong apparently after the house was being constructed by Davis and Anderson on one of the lots, and he then went to Clark about the mistake. Miller's mother said she thought that that visit was made in May, 1918, when they talked about changing the deed and told Miller that the wrong lot had been described in the contract and the deed they had already received. There is some testimony on the part of appellants to indicate that Clark promised at that time to try to have the correction made, but Clark testified that he told Miller at that time that the transaction with reference to these lots and the building on them had gone so far he did not think the correction could be made in the deed transferring the description from lots in block 4 to lots in block 5. The receipt

as to lot 6 contained, among other things, the following: "This receipt must be presented at the office of F. W. Davis, sales manager, and exchanged for regular contract. All sales subject to approval of sales manager." The receipt was not exchanged for a contract, but as Miller had made payment in full, a deed was sent to him for lot 6 in block 4 instead of in block 5.

While the chancellor in a proceeding for specific performance to convey real estate should not arbitrarily refuse relief to one who clearly shows he is entitled to it, yet specific performance is not granted as a matter of right but rests in the sound discretion of the court. The right to specific performance depends upon the circumstances of each case, and where it appears that it would be inequitable to enforce the terms of the contract it will not be done. (*Frisby* v. *Ballance,* 4 Scam. 287; *Dreiske* v. *Eisendrath Co.* 214 Ill. 199; *Adams* v. *Larson,* 279 id. 268.) Beyond question, the decisions of this State, even where the terms of a contract are clear, certain and unambiguous, hold that specific performance is not a matter of right but rests in the sound discretion of the court, to be determined from all the facts and circumstances of each case. It would seem clearly to appear from this record that it would be inequitable, in view of the fact that Miller had permitted the matter to stand until there was a conveyance on record as to lots 5 and 6 in block 5 and a building constructed on lot 5 and the Home Building and Loan Association had granted a loan on the property, to require specific performance.

The chancellor rightly refused to enter a decree for specific performance and dismissed the bill for want of equity. The decree of the circuit court will be affirmed.

*Decree affirmed.*