Alfonso Escarraz, Sr., and Alfonso Escarraz, Jr., Appellees, v. Irving Escarraz, Appellant.

Gen. No. 47,048.

First District, Second Division.

October 22, 1957.

Rehearing denied November 15, 1957.

Released for publication December 4, 1957.

William S. Jacob, of Chicago, for appellant.

John E. Toomey and John P. Coghlan, for appellees.

JUDGE LEWE delivered the opinion of the court.
This action was brought by Alfonso Escarraz, Sr., and Alfonso Escarraz, Jr., for specific performance of an oral contract of sale by the defendant, Irving Escarraz, of his interest in a family partnership. Defendant filed a counterclaim for an accounting and dissolution of the partnership. The cause was referred to a master, and in conformity with the findings and recommendations contained in his report, a decree was entered in favor of the plaintiffs. The counterclaim was dismissed. Defendant appealed. Plaintiffs have cross-appealed from an assessment of the costs equally between the parties.

The essential issues presented on appeal are whether the evidence sufficiently establishes that Irving Escarraz agreed to sell his interest in the partnership and the plaintiffs agreed to buy it; whether the agreement

between the parties, is fair, just and equitable so as to admit of a decree for specific performance; whether the oral agreement is repugnant to the Statute of Frauds and whether the chancellor abused his discretion in taxing the costs to the parties equally.

Defendant contends that the chancellor erred in confirming the findings of the master, on the ground that they were against the manifest weight of the evidence.

The master found that since the continued operation of the partnership had become impossible because of disharmony among the partners, stemming from an irreconcilable difference of opinion on the subject of expansion of the business, the defendant accepted the offer of withdrawal from the partnership made by the plaintiffs upon the following terms: $63,000 in full for his share of all the partnership assets in payments of $23,000 down plus equal payments of $20,000 each within three and six months thereafter; and that the defendant signified his acceptance of this offer by completing the blank check, cashing it, delivering his keys to the premises, paying for groceries and not being active in the business.

We believe that the record discloses substantial evidence justifying the finding that Irving agreed to sell his one-third interest in the partnership to his father and brother in installments and accepted a part payment of $25,000 from them. The relationship between the partners, especially between the two brothers, had become embittered almost beyond hope of reconciliation by November 1, 1954. Consequently, in a conversation on that day the defendant offered Alfonso, Jr., to let him leave the business and pay him his money. In response to the latter's question, "How much do I have coming?" Irving looked up the book value as of December 31, 1953, and told Alfonso, Jr., that his share would be $63,000, as the book value was $189,000. Then he wrote the terms of payment on a piece of paper as follows: $23,000 now and four tri-monthly

installments of $10,000 each. But Al, Jr. requested two installments of $20,000 each in three and nine months, respectively. Irving consented and changed his figures on the paper accordingly. However, Irving refused to sign the partnership check, made payable to his order by Al, Jr. in the sum of $23,000 in "payment of partnership sale." Alfonso, Sr., unwilling to let this son withdraw, likewise refused to sign it. Subsequently, Irving took a vacation and "wasn't going to come back to the store until there was an agreement on the subject (of expansion)."

November 30, 1954, defendant told plaintiffs that he was not going to "work for this kind of money." Al, Jr. replied: "I will give you your money, just like you wanted to give it to me" and made out a blank check to Irving. Irving accepted the check with the words, as his father testified, "Give it to me, I will take it," realizing according to his own testimony that Al, Jr. intended that the check should constitute a first payment on the sale.

December 22, 1954, the defendant cashed the check for $25,000. There is no conflict in the testimony that he was then told that he was through and that he should keep out of the store. The record further shows that Al, Jr. then demanded that defendant surrender the keys to the premises and the car and that he pay cash for the groceries which he selected to take home; that the locks to the store were changed and that defendant drew no salary for three weeks and did not return until January 2, 1955.

Defendant says that he withdrew the $25,000 from the partnership account not as part payment for the sale of his interest but as a portion of the accumulated profits to which he was entitled under the terms of the partnership agreement. This contention is apparently corroborated by a notation on the check that the withdrawal was a "reduction of equity only" and a similar statement on the check stub. However, Irving admitted

265

that the notation on the check was not made until in January after the cancelled check was returned by the bank. As regards the statement on the check stub the evidence is controverted. Irving claimed that he wrote it immediately after he cashed the check on December 22, while Al, Jr. testified that there was no such notation on the stub on December 24 and that he saw it for the first time only on January 5. On this subordinate issue we are satisfied that the master's finding that the notation on the check was defendant's first indication that he considered the sum withdrawn not as a part payment, is not manifestly against the weight of the evidence.

Defendant also asserts that his father was not a party to the transaction, even if it be assumed that the two brothers validly contracted and that he should not be allowed, by joining in the complaint, to ratify a contract, not binding on him, because it turns out to be advantageous to him. The master found that both plaintiffs made an offer to buy defendant's interest on November 30, and we think the evidence in the record amply supports his finding. Alfonso, Sr., was an eye-witness to the conversation and transaction on that day and he knew that his son, Alfonso, offered to buy Irving's interest on plaintiffs' behalf on the same terms that he had previously agreed to sell his share. There is testimony, although contradicted by defendant, that Alfonso, Sr., did not object to the proposal as he did earlier when Alfonso, Jr., desired to withdraw but, on the contrary, that he advised Irving that if he accepted the check he was through. Later Alfonso, Sr., merely requested the bank to notify him if a large check came through—he had not stopped payment on it, as defendant's own witness, a cashier at the partners' bank, conceded. He also changed the locks on the premises and told Irving that he could not come back to the store. These subsequent acts may be construed as manifestations of his position.

■ ■ The foregoing evidence establishes clearly that the partners entered into the alleged contract and that its material terms were definite and certain. We conclude on this issue, therefore, that the chancellor's decision, approving the master's findings, was not erroneous, since the findings are not clearly and manifestly against the weight of the evidence. (Punzak v. DeLano, 11 Ill.2d 117.)

■ Defendant urges next that, even though the agreement be found certain and unambiguous in its essential terms, plaintiffs are not entitled to a decree of specific performance because the agreement is unfair and unjust and its enforcement would be oppressive and inequitable for the reason that his interest was actually worth $94,000. The master, however, found that payment to one of the partners of $63,000 based upon the book value of the assets of $189,000, exclusive of good will, is a fair consideration and payment for the partner's interest, if such payment is made in an accelerated manner and not according to the terms of the partnership agreement which provides, in case of sale of a partner's interest, for monthly payments of $75 until paid. Neither are we convinced that these findings are against the manifest weight of the evidence, for the facts are that the defendant himself valued a one-third interest in the partnership at $63,000, disregarding income and good will elements, when he offered to buy his brother's share on November 1, and the partnership agreement stipulated that "the withdrawing partner shall not receive credit for the good will of the business." We cannot agree with defendant that "this contract is so one-sided that a court of equity cannot lend its aid to its enforcement." (Koch v. Streuter, 232 Ill. 594, 604.) Nor do we think that Miller v. Clark, 301 Ill. 273, and Sutton v. Miller, 219 Ill. 462, relied on by defendant, are controlling, for they in effect merely hold that specific performance

267

is properly denied where plaintiff's case contains estoppel elements.

██ It is further contended by defendant that the oral agreement would be repugnant to the Statute of Frauds, as a large portion of the partnership assets consisted of real estate. In this respect the master found that, since a co-partnership existed under a written agreement of 1935, the real estate as part of the partnership assets was to be considered as personalty. The state of Illinois is one of the jurisdictions that adhere to the doctrine of "out and out" conversion, that is, conversion into personalty for all partnership purposes, including the settlements of partnership affairs. (Wharf v. Wharf, 306 Ill. 79; Swirsky v. Horwich, 382 Ill. 468.)

Lastly, the plaintiffs contend that the chancellor abused his discretion in assessing the costs of the suit equally between the parties, as recommended by the master, rather than solely against the losing party. In actions in equity the chancellor may, in his discretion, apportion the costs between the parties and, unless he clearly abuses that discretion, his order assessing costs will not be disturbed. (Davis v. Huguenor, 408 Ill. 468; Hess v. Gilbert, 333 Ill. App. 330.) Plaintiffs rely on Carrell v. Hibner, 405 Ill. 545. We think that case is distinguishable. There the chancellor decreed a division of the costs between the parties in the face of the master's recommendation that the expenses be charged to defendants. Here the chancellor taxed the costs in accordance with the recommendations of the master, who knew the interests and the temper of the parties and who was better qualified than anyone else to appraise the respective positions of the parties fairly and equitably. We do not believe that the chancellor exercised his discretion arbitrarily so as to "result in injustice or oppression."

268

It is our conclusion that the decree of the court below should be affirmed in all respects.

Decree affirmed.

KILEY, P. J. and FEINBERG, J., concur.