ROBERT SPIRCOFF, Plaintiff-Appellee, v. HELEN R. SPIRCOFF, a/k/a Helen S. Baron, Defendant-Appellant.

First District (2nd Division)    No. 78-772

Opinion filed July 10, 1979.—Rehearing denied August 1, 1979.

A. Denison Weaver, of Chicago, for appellant.

Leon C. Wexler, of Chicago, for appellee.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Pursuant to a prior lawsuit, plaintiff Robert Spircoff (hereinafter Spircoff) and defendant Helen Spircoff Baron (hereinafter Baron) entered into a settlement agreement in June 1974 whereby Baron became 100% beneficial owner of a certain parcel of real property and Spircoff acquired a right to sell said property and to receive $50,000 of the proceeds under stated circumstances. In March 1976 Spircoff filed a complaint for

declaratory judgment requesting that the court declare Spircoff was entitled to the sum of $50,000 from a proposed sale. The court found that the settlement agreement contained language granting Spircoff a right to $50,000 of the proceeds in the event of a sale by either Baron or Spircoff. The court granted judgment to Spircoff in the amount of $50,000. Baron appeals.

The sole issue for review is whether the trial court's interpretation of the settlement agreement is contrary to the manifest weight of the evidence.

We affirm.

In March 1967 Spircoff and Baron, who are brother and sister, became beneficial owners in equal interest in a land trust known as Oak Park Trust and Savings Bank Trust No. 5327. The trust held title to a parcel of land located at 1247 South Harlem Avenue, Berwyn, Illinois, which Spircoff developed with a 32-unit apartment building. On March 27, 1967, the parties entered into a written agreement which provided that Spircoff would manage the property; that for a five year period from 1967 to 1972 Baron would share in the earnings in an amount not less than $7,000 per year; and that if Spircoff failed to pay such amount, Baron's interest would be increased by 10% for each default.

In April 1972 Baron filed an action for an accounting and a constructive trust, alleging that Baron received no payments under the agreement of March 1967 and was therefore entitled to an increase in her interest in an amount equal to Spircoff's 50% share. Baron further alleged that Spircoff with intent to defraud Baron transferred his interest in the trust to a third party. On June 5, 1975, the action was dismissed with prejudice because the parties entered into a settlement agreement to resolve all matters in controversy between the parties. Pursuant to the agreement of June 5, 1975 (hereinafter Agreement), Spircoff assigned his undivided one-half interest in the land trust to Baron. Baron agreed in Clause 3 of the Agreement that for a period of four years Spircoff would have the following rights:

"A) He may secure a purchaser for the property at a gross sale price of $504,000.00.

B) From the proceeds of said sale Spircoff shall receive $50,000.00; however if the sale is made in the first 18 months he shall remit $2500.00 to Baron.

C) The sale must be to a cash buyer, who may purchase subject to the existing mortgage.

D) In no event shall the gross sale price be less than $454,000.00 and on any sale less than $504,000.00 the payment to Spircoff shall be reduced by the difference between $504,000.00 and the gross

sale price. Thus on a sale by Spircoff for $490,000.00, Spircoff would receive $36,000.00 from the proceeds.

E) It is understood that in the event Spircoff secures the purchasers through his own efforts, he will not be entitled to a broker's commission on said sale. However, if the sale is made through a broker secured by Spircoff, Baron shall only be responsible for one-half of the usual brokerage fee and Spircoff shall be responsible for the balance of said fee to the broker.

F) NOTWITHSTANDING any of the foregoing, it is understood that during the first year of this agreement Spircoff or Baron must secure a gross sale price of $550,000.00 for Spircoff to receive $50,000.00. On any sale by him during the first year at less than $550,000.00, his payment shall be reduced on a dollar for dollar basis and therefore no sale can be contracted [by] him at a price less than $500,000.00. However, Baron may sell the property during the first year at a gross sale price of between $504,000.00 and $550,000.00 and still be obligated to Spircoff for $50,000.00. At any sale under $504,000.00 the provisions in the aforesaid paragraphs apply and Spircoff would receive a reduction on a dollar for dollar basis."

It was further agreed between the parties in Clause 8 that:

"In the event Baron desires to sell the property prior to the termination of this Agreement, Spircoff shall have the right of first refusal to purchase said property on the same basis and at the same price as any offer from any bona fide purchaser."

Baron agreed also to hold Spircoff harmless on an existing mortgage on the property, which mortgage had been personally guaranteed by both parties.

In July and September of 1975 Spircoff requested from Baron an income and expense statement for the property so that he could arrange for a sale of the property. On November 19, 1975, Spircoff filed a motion requesting production of a statement of income and expenses. On January 12, 1976, the court ordered that Baron provide such statement within 28 days. On March 2, 1976, Spircoff filed a motion for rule to show cause why Baron should not be held in contempt for failure to produce the statement in accordance with the court's order of January 12, 1976. The court ordered that Baron produce the statement prior to March 8, 1976. On March 8, 1976, a rule to show cause was entered against Baron and a hearing was scheduled for March 15, 1976.

On March 15, 1976, Baron filed a motion for an order limiting to 15 days the time in which Spircoff had to exercise his right of first refusal. Baron alleged that she had received an offer to purchase the building for $580,000 from a person subsequently identified as Mr. Gangas, and that

she required a determination of the time limit before making a binding contract. The court ordered that Spircoff had 30 days to exercise his right of first refusal. On March 17, 1976, Baron furnished Spircoff with a copy of the proposed sales contract and a statement of income and expenses for the property. The court further ordered that Spircoff had seven days in which to file a complaint for declaratory judgment to determine what, if any, part of the proceeds of the proposed sale Spircoff was entitled to under the Agreement.

Spircoff filed a countercomplaint for declaratory judgment on March 23, 1976. Spircoff alleged that for the prior six months he attempted without success to obtain the income and expense statement so that he could secure a purchaser; that Baron refused to supply the statement thereby breaching an implied condition of cooperation; that Spircoff had a right to sell the property and within one week after receiving the financial statement Spircoff tendered to Baron a contract from one Albert Bruno to purchase the property at a price of $504,000 (which Baron refused on March 29, 1978); and that the proposed contract with Mr. Gangas submitted to Spircoff by Baron was not a binding contract but rather was an option to purchase. Spircoff requested the court to declare that he had a reasonable time after receipt of the financial statement from Baron to secure a purchaser and that Baron should convey the property to either Gangas or Bruno and should deposit the sum of $50,000 with the clerk of the court for the use of Spircoff in the event of a closing.

On April 14, 1976, the court ordered that Spircoff's right of first refusal was extended to April 26, 1976. On the latter date the court continued in force and effect all pending orders until April 28, 1976, and then until further order of court. On May 6, 1976, Baron filed a motion for an order declaring that the time for exercise of the right of first refusal had expired, or for an order requiring Spircoff to post bond to indemnify Baron from any damages resulting from Baron's inability to consummate the sale. Baron's motion was denied and Baron filed an interlocutory appeal from the orders of April 14, 1976, and May 6, 1976.

On June 16, 1976, an agreed order was entered stating that the right of first refusal was waived by Spircoff and the pending interlocutory appeal was dismissed. On June 17, 1976, the court ordered Baron to deposit the sum of $50,000 in an escrow account at the time of closing. The closing occurred shortly thereafter.

A hearing was held on Spircoff's countercomplaint for declaratory judgment,[1] and the following testimony was adduced: Helen Baron, called to testify under section 60 of the Civil Practice Act (Ill. Rev. Stat.

---

[1] The evidentiary hearings began on April 9, 1976, and were then further conducted on February 4, 1977, April 1, 1977, and July 12, 1977. Final arguments were heard on January 9, 1978, and the court entered its order for Spircoff on February 2, 1978.

1975, ch. 110, par. 60), testified that she entered into the Agreement with her brother (Spircoff) as a result of a trial; that since the date of the Agreement she has been managing agent of the building in question—she collects the rent and pays the bills; and that after she became aware of the court's orders that she produce an income and expense statement, Baron contacted her accountant and gave him the necessary figures and she first received the statement on March 15, 1976. Baron further testified that on or about February 24, 1976, she received from Gangas a contract to purchase the property at a price of $580,000; that a rider showing the rents and expenses was attached to the contract at the request of Gangas; that she did not recall giving any broker any statement of income and expenses within the previous six months; that she produced the statement of income and expense on March 15, 1976, in open court; and that within a week thereafter she received through Spircoff an offer from Albert Bruno to purchase at a price of $504,000 but the offer was rejected by Baron because she already had what she considered "a bona fide deal" with Gangas. Baron testified on direct that she never refused to produce a financial statement; that while Spircoff managed the building prior to June 1974, Baron never received from Spircoff a financial statement; and that Bruno made a second offer which would have eliminated payment of a brokerage fee, but it was still not acceptable to Baron. Baron had paid no money to Spircoff under the Agreement.

Charles Koselke testified that he was employed by First Federal Savings and Loan of Chicago and held the position of assistant vice-president on commercial mortgage lending. Mr. Koselke testified that on a loan of $580,000 for a 32-unit apartment building, the maximum amount which can be loaned as determined by Federal regulations is 80% of the purchase price; and that the prevailing rate of interest on multifamily property in the community at that time was 9½ to 10% plus 1½ to 2 points.[2] It was stipulated that a lending institution could make an 80% mortgage even if the contract called for an 82% mortgage, provided that the seller agreed. It was further agreed that under the proposed contract of sale, the seller could grant a purchase money mortgage. The contract from Gangas to purchase at a price of $580,000 received by Baron on February 24, 1976, called for an 82% mortgage at a rate of interest of 8½% plus one point.

Howard Serlin testified that he was a certified public accountant employed by Baron since 1961 or 1962. In early March of 1976 Serlin was requested by Baron to prepare an income and expense statement for use of a prospective buyer of the property. Baron supplied the necessary documentation to Serlin and he prepared the statement in one evening.

---

[2] The testimony of Koselke highlights Spircoff's contention questioning the legitimacy of Gangas' offer since the 82% mortgage exceeded the legal limitation and since the interest rate of 8½% was not consistent with the prevailing rate at the time.

For the years 1974 and 1975 Serlin prepared Baron's income tax returns which reflected the income and expenses of the building. While Spircoff managed the building, Serlin was provided with year-end information for 1973 and for the period ending June 1974. Serlin could not recall being advised by anyone that Spircoff had found a potential purchaser.

It was stipulated that Spircoff sent a letter to Baron on July 25, 1975, requesting an accounting and that a letter dated September 22, 1975, was sent to Spircoff from Baron stating there was no obligation to furnish an accounting, but she would furnish such if Spircoff had a potential purchaser.

Robert Spircoff testified that he did not receive the income and expense statement until March 15, 1976, when Baron submitted such to him along with a proposed contract of sale to Gangas at the price of $580,000; that after receipt of the statement Spircoff called Battisti Realty and informed the broker that the building was ready for sale; that Spircoff received from Bruno a contract to purchase the building at the price of $504,000 and a financial statement, and he submitted both to Baron within one week of March 15, 1976. Spircoff testified on cross-examination that he knew the income and expenses of the building up to June 1974 (the period during which he managed the building); that nothing in the Agreement states Baron was to furnish to Spircoff an income and expense statement; that prior to receiving the statement from Baron on March 15, 1976, Spircoff did not have a potential purchaser; that he made no effort in 1974 or 1975 to sell the building or to exercise his right of first refusal; and that Bruno turned down in June 1974 an offer to sell him the property. Spircoff testified further that he could not sell the building without a current income and expense statement and that he requested the information from Baron so that he could procure a buyer.

Albert Bruno testified that he submitted to Spircoff a contract dated March 22, 1976, to purchase the building and a financial statement which showed his financial position as of March 1976, but the contract was rejected by Baron. Bruno had $100,000 in cash to pay an earnest money deposit, and he had the ability to procure a mortgage of 75 to 80% of the sale price. On cross-examination Bruno testified that he learned about the availability of the building from Mr. Battisti and Spircoff; that he was not familiar with the income and expenses, but in a deposition he had stated that he knew the building and could approximate the income and expenses; that Bruno was a business partner of Spircoff in some ventures; that at the time he signed the contract he had no arrangements for financing, but he submitted with the contract a note in the amount of $10,000; and that the financial statement shows his financial position as of December 31, 1974, and does not reflect additional cash possessed by him or 10 businesses which he owned.

William McCann, a professional real estate appraiser and consultant and a licensed real estate broker, testified as an expert witness that he examined the alleged contract of sale from Gangas dated February 24, 1976. In his opinion the document was not a bona fide offer because the mortgage clause recited an amount (82%) that was in excess of that obtainable from any regulated savings and loan and the interest rate recited would not have been available at that time. McCann was of the opinion that the mortgage clause gave the buyer an option out of the contract because the conditions recited were not obtainable. McCann testified a buyer of the type of property in question would require a current "rent rule" indicating the total gross rents achievable from the property, a copy of all existing leases and the most recently ascertainable list of expenses. A broker listing such property would require the same information. On cross-examination McCann testified that the contract allowed for a purchase money mortgage upon the terms recited so that if the seller wanted to hold the buyer to the contract, the seller had the option of granting a purchase money mortgage.

Martin Silver testified that he acted as sales agent on behalf of Baron for sale of the property in question. The contract dated February 24, 1976, was drafted in Silver's office in February 1976 and at that time Silver had estimates of the income and expenses from Baron; he received accurate figures 30 to 60 days later. The property was sold at a price of $580,000 to Mr. Gangas, who did not obtain a mortgage on the terms stated in the contract but rather obtained a mortgage in the amount of $464,000 at a rate of 9%. It was stipulated that the sum of $50,000 was placed in escrow pending disposition of this case.

Based on the foregoing, on February 2, 1978, the trial court granted judgment for Spircoff in the amount of $50,000. The court found (1) that there was an implied condition in the Agreement that Baron would provide Spircoff the information necessary to procuring a purchaser; (2) that Spircoff requested current income and expense information from Baron and until March 15, 1976, failed to receive same; (3) that within seven days after the income and expenses were provided to Spircoff, he produced a contract to purchase at a price of $504,000; (4) that Baron in signing the Gangas contract agreed to a mortgage contingency clause providing for a mortgage in an amount and at an interest rate that was neither obtainable nor legally permitted in the State of Illinois by the usual financing sources; (5) that on April 25, 1976, the purported contract terminated when neither Baron nor Gangas obtained or agreed to a mortgage as provided in the mortgage clause; (6) that as a result of the implied condition in the Agreement and an order of the court, Baron was required to submit to Spircoff a current income and expense statement, and that Baron wilfully, flagrantly and intentionally failed to submit such

statement until after she had secured the purported contract from Gangas; (7) that Spircoff provided a contract to Baron within the time limits provided by the Agreement and at a time when there was no bona fide offer to purchase pending but a mere option which was not contemplated under the language of the Agreement; (8) that Baron interfered with rights granted to Spircoff under the Agreement and thereby breached an implied condition of cooperation; and (9) that the Agreement did not have express language limiting the payment to Spircoff to a sale by him only and in fact contained language to the contrary.

Baron contends that the court erred in granting judgment for Spircoff and that the following findings made by the court are not supported by the evidence: (1) that Baron was obligated to furnish a statement of income and expenses; (2) that the Gangas offer to purchase was not bona fide; and (3) that the Agreement did not limit Spircoff's right to receive proceeds only to a sale secured by Spircoff. Baron does not challenge directly the finding that she interfered with Spircoff's rights under the Agreement; however, Baron assumes the interference consisted of her failure to furnish an income and expense statement. Spircoff contends that the court's findings are supported by the evidence and that his offer of a purchaser within one week after obtaining the statement of income and expenses requires payment to him under the Agreement.

■■ It is well established that the primary objective in construing a contract is to give effect to the intention of the contracting parties. (*Schek v. Chicago Transit Authority* (1969), 42 Ill. 2d 362, 364, 247 N.E.2d 886.) The parties' intent must be determined solely from the language of the contract unless the language is ambiguous; however, language is not rendered ambiguous simply because the parties do not agree upon its meaning. (*Harris v. American General Finance Corp.* (1977), 54 Ill. App. 3d 835, 839, 368 N.E.2d 1099.) A contract is to be construed as a whole, giving meaning and effect to every provision thereof, if possible, since it is presumed that every clause in the contract was inserted deliberately and for a purpose. (*Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 283, 154 N.E.2d 683.) The construction given an agreement by the trial court will not be set aside unless contrary to the manifest weight of the evidence. *Bleck v. Stepanich* (1978), 64 Ill. App. 3d 436, 439, 381 N.E.2d 363; *Sigma Delta Tau Society v. Alongi* (1976), 44 Ill. App. 3d 650, 652, 358 N.E.2d 906.

■■■ The trial court determined that there was an implied condition of cooperation in the Agreement and that Baron was obligated thereunder to furnish an income and expense statement to Spircoff. It is well established that every contract contains an implied promise of good faith and fair dealing between the contracting parties. (*Martindell v. Lake Shore*

*National Bank*, at 286.) Even though the express words are absent, the court "will compel performance in accordance with what it believes to be required by good faith and fair dealing." (*Dasenbrock v. Interstate Restaurant Corp.* (1972), 7 Ill. App. 3d 295, 300, 287 N.E.2d 151, citing 3 Corbin, Contracts §541, at 95 (1960).) In the case at bar the Agreement clearly states that Spircoff had a right to sell the property for a period of four years. The evidence established that a statement of income and expenses would be necessary in order to secure a purchaser for the type of property in question. Mr. McCann, the expert witness, testified that a buyer and a broker, before listing such property, would require such information. Baron testified that the actual purchaser requested that the income and expense statement be incorporated into the contract as a rider. The evidence also showed that Spircoff made several requests for the statement from July 1975 to March 1976 and that Baron had at least estimates of the income and expenses as early as February 1976, and that her accountant had the figures before that time to prepare Baron's income tax returns. We conclude that the trial court's finding that there was an implied condition of cooperation which plaintiff breached is supported by the evidence.

■ We find also that the trial court's determination that the contract secured by Baron was not bona fide, but rather was an option to purchase, was supported by the evidence. It was undisputed that the contract called for a mortgage that exceeded the legal limitation and a rate of interest that was not consistent with the prevailing rate at the time. Although the contract permitted a purchase money mortgage on the stated terms, the offering of such a mortgage was at the option of Baron. Thus, the record supports the court's finding that there was only an option to purchase and not a bona fide offer.

Finally we must determine whether the trial court's interpretation of the Agreement as not limiting Spircoff's right to receive a portion of the proceeds to only a sale secured by him is contrary to the manifest weight of the evidence.

The language of clauses 3A and 3B of the Agreement clearly states that Spircoff had, for a period of four years, the right to sell the property at a price of $504,000 and to receive $50,000 from the proceeds of "said sale." Clause 3B uses the language "said sale" thereby appearing to limit the right to a portion of the proceeds only to a sale procured by Spircoff. Clause 3F, on the other hand, contains language that Spircoff is to be paid a portion of the proceeds regardless of who procures the purchaser as long as the selling price is at least $504,000. The clause provides in pertinent part:

> "* * * during the first year of this agreement *Spircoff or Baron* must secure a gross sale price of $550,000 for Spircoff to receive

$50,000.00 * * * Baron may sell the property during the first year at a gross sale price of between $504,000.00 and $550,000.00 and still be obligated to Spircoff for $50,000.00." (Emphasis added.)

Although clause 3F contains language limiting its effect to the first year of the Agreement, the purpose of the clause appears to be to set a higher sales price during the first year for the benefit of Baron and not to grant Spircoff an additional right to share in the proceeds during the first year. The implication is that Spircoff had a right to share in the proceeds from any sale as long as the selling price was above a certain amount at any given time. Clause 8, which grants Spircoff a right of first refusal to purchase the property, complements his right to share in the proceeds of any sale. The right of first refusal grants Spircoff some rights in the event that a sale cannot be made at a price of at least $454,000, since if a sale is made for less than such amount Spircoff would receive nothing. Clause 8 does not contain language limiting the right of first refusal to the last three years of the Agreement. Thus, Baron's interpretation that Spircoff could share in the proceeds for the first year but thereafter was limited to a right of first refusal is not supported by the language of the Agreement.

■■ We note further that if Baron's interpretation of the Agreement is accepted, the result is an illusory contract. Spircoff had a right to sell the property for a period of four years. Since the Gangas contract was only an option to purchase, there was no bona fide offer which Spircoff was required to meet by the terms of his right of first refusal. Thus, Spircoff secured a purchaser in accordance with the terms of the Agreement. It is true that there is nothing in the Agreement which requires Baron to accept Spircoff's purchaser. However, if the contract is interpreted as allowing Baron to reject without liability any purchasers secured by Spircoff, then the contract is illusory. Spircoff could complete his performance and never receive any benefit and in effect Baron has made no binding promise. It is a well-established rule of contract construction that courts will adopt a construction which supports, rather than nullifies, the contract. (*Schiro v. W. E. Gould & Co.* (1960), 18 Ill. 2d 538, 543, 165 N.E.2d 286.) Thus, we conclude that the evidence supports the trial court's finding that Spircoff had a right to share in the proceeds of any sale regardless of who procured the purchaser. Further, we conclude that Spircoff completed his performance under the terms of the Agreement and was damaged in the amount of $50,000.

Based on the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

DOWNING and HARTMAN, JJ., concur.