(No. 15700.—Decree affirmed.) .

WILLIAM S. CARVER et al. Appellants, vs. LUTHER E.
VANARSDALE, Appellee.

*Opinion filed April 14, 1924.*

1. SPECIFIC PERFORMANCE—*party seeking specific performance
must show readiness to perform his part of agreement.* A party
seeking specific performance of a contract must show that he is,
and was at the required time, in a position to fully and completely
perform his part of the contract, and that he has taken all proper
steps towards performance on his part or show a reasonable and
just excuse for not taking such steps.

2. SAME—*when vendor is not in position to demand perform-
ance.* A vendor in a contract for the sale of land is not in a posi-
tion to demand performance by the vendee where he failed to
tender a deed and abstract on the day fixed upon in his contract,
on which day he had written the vendee he would expect him to
complete the contract, notwithstanding the vendee was furnished
an opinion by an attorney who had examined the abstract and was
tendered a deed on the next day.

3. SAME—*party cannot impute negligence based on his own mis-
representation.* One who by misrepresentation has induced an-
other to act to his prejudice cannot impute negligence to the lat-
ter because of his reliance upon the former's misrepresentation.

4. SAME—*contract must be free from fraud and misrepresenta-
tion.* To warrant a decree for specific performance the contract
must be just, reasonable and free from fraud and misrepresenta-
tion; and this must be so clearly established as to enable the court
to see that it would be unjust and against good conscience to re-
fuse to compel specific performance.

5. SAME—*specific performance cannot in all cases be granted as
a matter of right.* Unless the record shows that the parties to a
contract have entered into it fairly and understandingly, specific
performance will not be granted as a matter of right but the·grant-
ing thereof rests in the sound discretion of the chancellor, subject
to review only in case of abuse of that discretion.

6. SAME—*dismissal of a bill for specific performance does not
necessarily require rescission of contract—burden of proof.* Evi-
dence may be sufficient to defeat a bill for specific performance
though not sufficient to authorize a decree for rescission of the
contract; and the dismissal of a bill on grounds of fraud and mis-
representation, dual agency and failure of complainant to perform
his part of the agreement does not necessarily mean the contract

was so tainted with fraud that it should be canceled and the defendant, as prayed in his cross-bill, be allowed to have returned to him personal property which he delivered pursuant to the agreement, but the burden rests on the defendant to prove his right to such cancellation.

7. PRINCIPAL AND AGENT—*an agent cannot act for both parties.* An agent cannot act for both parties to a contract, whose interests are adverse, unless he discloses that fact to each party.

APPEAL from the Circuit Court of McDonough county; the Hon. GEORGE C. HILLYER, Judge, presiding.

LAWYER & HAINLINE, and HAYCRAFT & McCUNE, for appellants.

O'HARRA, O'HARRA & O'HARRA, for appellee.

Mr. JUSTICE STONE delivered the opinion of the court:

Appellants filed a bill in the circuit court of McDonough county to enforce a contract for the sale of certain Minnesota land. The defenses were a failure on the part of appellants to perform at the time the contract was to be completed, fraud, and dual agency of A. C. Harris. Appellee filed a cross-bill for the return of five stallions, or the value thereof, fixed by the contract of sale at $6000, which had been delivered to appellants on the contract. The circuit court of McDonough county entered a decree dismissing both the original and cross-bills, and appellants bring the record here for review. Appellee has assigned cross-errors to that part of the decree dismissing his cross-bill.

Appellants, husband and wife, are residents of Fairmont, Minnesota, and in 1920 owned the farm which is the subject matter of this lawsuit. Appellee is a resident of Blandinsville, in McDonough county, Illinois, a farmer and stock raiser by occupation, approximately sixty years of age. He is the owner of different farms and the raiser of breeding horses. It appears that in the spring of 1920 he desired to

dispose of some of these horses. A. C. Harris, a real estate dealer, also a resident of Blandinsville, who is shown by the record to have been on friendly terms with appellee, suggested that he trade the horses for farm land; that it would be difficult to sell them for cash at that time; that he was going to Minnesota and might be able to find some land for him. It appears that Harris had lived in Minnesota for a number of years and had been acquainted with appellants, having acted as deputy sheriff for appellant Carver, who, as the record shows, had been for some years, and was at the time of the hearing, sheriff of Martin county, Minnesota. Harris went to Minnesota and while there learned from Carver that he desired to dispose of the land in question. He suggested that he could probably find a buyer if Carver was willing to take in trade some stallions. It appears that Carver at that time was not interested in the matter, but later, after the return of Harris to Blandinsville, wrote to him, suggesting that if appellee still had the horses they might make a trade. Upon receipt of this letter Harris informed appellee of its contents, and negotiations were then opened by which Harris was to represent appellee in attempting to make a trade for this property. Harris was to receive two per cent of the price received in trade for five stallions, which were to be offered in trade at $7000. It appears that Harris had theretofore arranged with Carver for a commission of $500 for the sale or trade of the farm, and it is not denied that he was expecting a commission from both parties, and that he did not inform either party that he was acting in a dual capacity before the contract was made.

The testimony of appellee is that Harris told him that Carver had paid $240 per acre for the land and that it was worth more money, and that if appellee would trade for the land he (Harris) would take a half interest in it. These statements were denied by Harris, who testified that he did not tell appellee what Carver paid for the land, and that

he said he would take a half interest in the land if he could sell his Dakota property. As to the first statement, appellee is corroborated by the testimony of one Gibbs, who testified that he overheard Harris make the statement as to the amount Carver paid for the land. Pursuant to Harris' suggestion appellee went with him to Minnesota, met Carver and the three drove out to see the farm. The farm consists of 200 acres and lies in an L-shape. One hundred and sixty acres lie in a strip measuring a mile north and south and a quarter of a mile east and west and embrace four 40-acre tracts. Three of these 40-acre tracts lie in the northeast corner of one section and the fourth is in the southeast corner of the section next north and is separated from the south three 40-acre tracts by an east and west public highway. The fifth 40-acre tract is in the southwest corner of the section lying east of that containing the north 40 acres last referred to, and therefore lies just east of the north 40 acres and separated therefrom by a north and south public highway. In other words, the north and south highway bounds four of the 40-acre tracts on the east and the fifth tract on the west, and the east and west highway separates the north 40-acre tract from the south three of the 160-acre strip. This land lies in three different sections and parts of it are separated by two cross-roads. The house is located at the cross-roads on the north 40, west of the north and south public highway.

As to the condition and character of the land there is much controversy in the testimony. It appears without dispute, however, that the tract in question contains much low, wet land. The parties visited it on the 10th of May. Appellee testified that at the time he saw it grass was growing over the portion that was not under cultivation; that he could not tell the character of the grass; that the meadow land appeared to have been burned over; that he was able to see that a swale or slough ran across a good deal of the land north and south; that Carver explained to him that

the east 40 was tiled.   It appears that this 40 was tiled un-
der a tile-ditch agreement, which showed that the tile had
been put in by the owner of this east 40 and others of that
neighborhood, together with the officials of the township.
By this tile-ditch agreement the officers of the township,
and others interested who desired to extend the tile ditch
or repair the same, were permitted to go upon this 40 acres
of land, and one of the controverted questions in the case
is whether or not this tile-ditch agreement was an incum-
brance on the land.   Appellee testified that Carver showed
him the outlet of a tile which opened into the middle 40
of the 120 acres lying south of the east and west cross-
road, and told him that it drained the south 60 acres
of the land Carver was attempting to sell to him.   The
water from this tile passed over that part of the 120 acres
lying north of the outlet, across the east and west road and
on northeasterly across the north 40.   The evidence shows
that the tile referred to drains the land of one Oathoudt
lying west and south of the Carver land and does not drain
any of the latter, and that it was allowed to run over and
upon Carver's land because the latter is the servient tene-
ment, the natural water-course apparently being in a north-
easterly direction across the land of Carver.   Carver denied
that he told appellee that this tile drained any portion of
his farm.   At the northwest corner of the south 120 acres
of land another tile which drained the land lying west of
it emptied into the public highway and through culverts
across the road north onto the land of Carver, which is
the north 40 of the four tracts lying north and south.   The
record shows that this increased the burden of water in the
slough running north and south across the land of appel-
lants.   Appellee testified he knew nothing and was told
nothing concerning this outlet tile or the increased burden
upon the Carver land by reason thereof.   The evidence,
however, shows that the natural course of drainage of the
land west of the Carver land is in the direction of this

outlet. Appellee testified that he could see a swale running through this land and that he had an opportunity to go all over it; that no one caused him to hurry, but that he could not see the tile condition and did not know the character of the tile agreement as to the east 40.

It appears that after viewing the farm the parties returned to Fairmont, where an attorney was called by Carver and a contract was entered into, by the terms of which the land was purchased by appellee for the sum of $240 per acre, or $48,000, to be paid as follows: $6000 credit by the transfer of the stallions; $6000 to be paid in cash March 1, 1921, on which date a warranty deed was to be given and an abstract furnished by the Carvers; $10,000 of the purchase price was to be paid by appellee assuming a first mortgage against the land for that amount and $9000 by assuming a second mortgage for such amount; the balance of $17,000 was to be paid by giving Carver a third mortgage against the land. The contract provided that an abstract should be furnished by January 1, 1921, evidently for examination, to be examined by February 1, and that it should be examined by a Minnesota attorney. Carver and Harris testified that at the time the contract was made appellee employed the law firm of Haycraft & McCune, counsel for appellants in this lawsuit, to examine the abstract for him. Appellee denies this but does not show the employment of any other attorney for that purpose.

Depositions of some twenty witnesses were taken as to the value of this farm. Thirteen witnesses placed it from $200 to $250 per acre, while seven placed it from $100 to $150 per acre, classing it as the poorest land in the township. It appears from the evidence that Carver did not pay $240 an acre for the land but bought it for approximately $177 per acre.

On January 26, 1921, the firm of Haycraft & McCune wrote to appellee informing him that they had examined the abstract of title to the land in question and found the

312—15

title to be good, subject to certain incumbrances against it. It appears that appellee did not reply to this letter but on February 25 wrote a letter to Carver, which was in part as follows: "I am writing to let you know that I cannot take that farm. I can't get the money. I told Harris to tell you and write back at once, and he never done it. I did not want to go up there at all, but he insisted on it and said he would take a half interest in it. I have told him for four months I could not handle it now. * * * I hate to lose what I have paid but I don't see any other way out. Would not have got into it if he had staid away and let me alone. I don't consider I have wronged you in any way, as you have the money you got from the horses and still have the land." To this Carver replied by wire: "You must live up to your contract; will be there March 1 with papers." Carver came to Blandinsville on the first of March and saw appellee. At the meeting between them there were present an attorney named Wood and a man named Whittaker. It appears that Carver did not have the abstract of title with him, and that the same had not been delivered to appellee but was in possession of the holder of the first mortgage. Appellee and his witnesses say that Wood told Carver that he (Carver) was not in a position to perform his part of the contract, for the reason that he had not delivered the abstract and had no deed there at that time, and that he could not give good title for the reason that there was a tile-ditch agreement incumbering the east 40, and that he was of the opinion that Carver was seeking to beat appellee out of his property. Carver claimed that he tendered a deed signed by himself and his wife and demanded the cash payment on March 1 but admits that he did not have the deed with him. He testifies that he had the deed prepared in Fairmont and took it with him when he went to Blandinsville; that he told appellee that he brought the deed along with him and had come to try to get him to fulfill his contract; that he had left the deed and mortgage

in his grip where he was stopping and would go and get them; that he offered to wire for an abstract; that appellee told him he could not raise the money. Wood, Whittaker and appellee testified that nothing was said about appellee's inability to pay the money at the conference on the first of March. Whittaker testified that Wood asked Carver if he had the abstract, and Carver said he did not. Wood said that they were not willing to go ahead with the contract; that he spoke of some controversy about the tile ditch; that he saw no papers there at that time. Carver testified that on March 2 he went to the house of appellee with Harris and handed him a deed and a note and mortgage for him to sign, and asked him to pay $6000 due on the contract; that he refused; that he asked him why, and he said he could not raise the money; that that was the only reason. In this Carver is corroborated by Harris, but appellee denies that he said he would not close the contract because he could not raise the money. It appears that thereafter, and prior to the filing of the suit, appellants had the abstract brought down, paid off the incumbrances other than those to be assumed by appellee under the contract, and paid the back taxes.

After the report of the master, and while exceptions thereto were pending before the court, Carver filed in the courts of Minnesota an action on the warranty of his grantor, one Lane, contained in the deed of these premises to him. In his declaration he set out that the tile-ditch agreement was an incumbrance on the title to this land and asked damages for breach of warranty. It appears that the facts in that case were stipulated, and no contest was made in the matter further than such as would arise on the construction of the contract and the facts stipulated. The trial court held that the tile-ditch agreement was not an incumbrance, and Carver appealed the case to the Supreme Court of Minnesota, where the holding of the trial court was affirmed, and the record of that proceeding was introduced

into the record of this cause prior to the decision of the chancellor.

It has been many times held in this State that one who seeks specific performance of a contract must show that he has done all things required of him. Appellants contend that appellee having on the 25th of February written a letter to them that he did not want to take the land because he could not get the money, thereby waived any other conditions of the contract, such as fraud or dual agency on the part of Harris. To this appellee replies that at the time he wrote the letter he did not know of the fraud as to the tile conditions of the land or of Harris' acting as agent of Carver in the deal, and that, moreover, since Carver replied by wire insisting upon the fulfillment of the contract on March 1, it was incumbent upon him to be prepared to do so at that time. Where the vendor seeks the remedy of specific performance after a refusal on the part of the vendee to perform his contract, it is necessary that he be in a position at the proper time to fully and completely perform his part of the contract. (*Bothwell* v. *Schmidt*, 248 Ill. 586.) It is evident that Carver was not prepared on March 1 to complete his contract. He did not have an abstract with him and none was tendered. While Haycraft, the attorney, sent appellee an opinion on January 26 advising him as to the condition of the title, yet under the terms of the contract an abstract was to be delivered to appellee on March 1. Such was not done, nor was the same done on the following day when Carver tendered a deed and mortgage. This in itself is enough to defeat the right of appellants to specific performance. A party seeking to compel specific performance is required to show that he has been in no default by failing to perform his part of the agreement, and that he has taken all proper steps towards performance on his part or can show a reasonable and just excuse for non-performance. *Bothwell* v. *Schmidt, supra; Short* v. *Kieffer,* 142 Ill. 258; *Brink* v. *Steadman,*

70 id. 241; *Anderson* v. *Frye,* 18 id. 94; *Scott* v. *Shepherd,* 3 Gilm. 483; *Doyle* v. *Teas,* 4 Scam. 202.

Appellants contend that they could not furnish the abstract on March 1 because it was in control of the mortgagee, as appellee knew, and that appellee had had the advice of counsel selected by him that the title was good. Assuming this to be the fact, though it is controverted by appellee, the contract called for a delivery of an abstract on March 1, and as Carver announced that he expected appellee to complete the contract on that day, the latter was entitled to have the abstract delivered to him on March 1. It appears that there was at least enough controversy over the question as to whether or not the tile-ditch agreement was an incumbrance on the land to cause the matter to be taken to the Supreme Court of Minnesota. It was not a matter of idle form, therefore, that the abstract should have been delivered on that day. That question was not settled by the Supreme Court of Minnesota until more than a year after the time for the completion of the contract. Appellants admit they were to furnish a merchantable title. Carver does not say that he tendered the deed and mortgage on March 1,—the day on which he insisted upon a settlement,—but that he did so the next day.

We are of the opinion that the equity of this contract is not established in the manner required to invoke the aid of a court of equity in carrying out and enforcing it.

There is, as we have seen, a dispute in the evidence as to the value of the land in question. Appellants' witnesses testified the land was worth from $200 to $250 per acre, while appellee's witnesses say the value of the land is from $100 to $150 per acre. The opportunities of most of the witnesses to know and to give an opinion of the value and condition of the land appear to be similar. Appellee testified that Carver misrepresented the condition of the farm as to tiling,—a condition which appellee could not know by seeing the farm. Carver denies this. There is no direct

testimony corroborating either party as to that matter. Appellants contend that there was no misrepresentation, and that even if there had been, appellee, by viewing the land himself, demonstrated that he did not rely upon it; that having used his own means to avoid deception and failing therein, he cannot be relieved from specific performance. The rule is that one who by misrepresentation has induced another to act to his prejudice cannot impute negligence to the latter because of his reliance upon the former's misrepresentation. (*Gilbey* v. *Hamlin,* 297 Ill. 258.) It is also the rule that it is not sufficient to justify a decree that a legal contract has been entered into. In order to warrant a decree for specific performance the contract must be just, reasonable and free from fraud and misrepresentation, and this must be so clearly established as to enable the court to see that it would be unjust and against good conscience to refuse to compel specific performance of it. *Wisherd* v. *Bollinger,* 293 Ill. 357; *Thackaberry* v. *Kibbe,* 284 id. 199; *Stubbings* v. *Durham,* 210 id. 542.

Specific performance of a contract cannot in all cases be demanded as a matter of right. Whether or not it shall be awarded rests in many cases in the sound discretion of the chancellor and is to be determined from all the facts and circumstances surrounding it. (*Keating* v. *Frint,* 291 Ill. 423; *Wolff* v. *Lawrence,* 276 id. 11; *Frisby* v. *Ballance,* 4 Scam. 287.) Unless the record shows that the parties to a contract have entered into the same fairly and understandingly, specific performance will not be granted as a matter of right but the granting thereof rests in the sound discretion of the chancellor, subject to review only in case of abuse of that discretion. (*Kilcoin* v. *Ortell,* 302 Ill. 531; *Stubbings* v. *Durham, supra; Tryce* v. *Dittus,* 199 Ill. 189; *Espert* v. *Wilson,* 190 id. 629.) We are of the opinion that this rule applies here. We are unable to say from this record that the chancellor abused the discretion vested in him in denying specific performance.

Appellee has assigned cross-errors, contending that he was entitled to have the return of the horses delivered on the trade, or the value thereof, as prayed in his cross-bill, and that such should follow an affirmance of the decree dismissing the original bill of appellants. This does not necessarily follow. It is not necessary, to authorize the court to refuse specific performance, that the agreement should be so tainted with fraud as to authorize a decree that it should be given up and canceled on that account. Evidence may be sufficient to defeat a bill for specific performance though not sufficient to authorize a decree for rescission of the contract. *Stephens* v. *Clark,* 305 Ill. 408; *Kilcoin* v. *Ortell, supra; Miller* v. *Clark,* 301 Ill. 273; *Mack* v. *McIntosh,* 181 id. 633; *Union Colliery Co.* v. *Fishback,* 299 id. 165; *Race* v. *Weston,* 86 id. 91; *Frisby* v. *Ballance, supra.*

It is contended that because Harris acted as agent for both parties without informing appellee, the latter is entitled to have the contract canceled and the value of the stallions returned to him. The general rule is that an agent cannot act for both parties whose interests are adverse unless he discloses that fact to each party. (*Cowan* v. *Curran,* 216 Ill. 598; *Bunn* v. *Keach,* 214 id. 259.) That Harris was acting as agent for both parties in this case is not denied, and his relations to Carver in the deal cannot be held to be consistent with his duty to represent appellee. While he insists that he was representing both parties, yet his conduct in attempting to do so without disclosing the fact to either of them is not consistent with the sort of dual agency that can be approved by a court of equity. He testifies that he told appellee on the trip back from Minnesota that he was to get $500 from Carver and that no objection was offered by appellee. Appellee denies this and testifies that he first learned of the dual agency a short time before the hearing. The fact, however, that he sets out Harris' agency with Carver as a ground for relief in

his cross-bill materially affects his credibility in that matter. If Harris is to be believed, appellee knew of the dual agency when Carver came to Blandinsville and got the horses, which was a short time after making the contract. The burden rested on appellee to prove his right to a cancellation of the agreement. The record does not afford him a preponderance of the evidence on the issues raised by his cross-bill.

We are of the opinion that the chancellor was justified by the record in leaving the parties as he found them. The decree is therefore affirmed.

*Decree affirmed.*