FOSTER ENTERPRISES, INC., Plaintiff-Appellee and Cross-Appellant, *v.* GERMANIA FEDERAL SAVINGS AND LOAN ASSOCIATION, Defendant-Appellant and Cross-Appellee.

Third District    No. 79-1006

Opinion filed June 4, 1981.

HEIPLE, J., dissenting.

Craig M. Armstrong, of Ottawa, and Donald L. Smith, of Hoagland, Maucker, Bernard, & Almeter, of Alton, for appellant.

T. Donald Henson and John S. Duncan, both of Herbolsheimer, Lannon, Henson & Duncan, P. C., of La Salle, for appellee.

Mr. JUSTICE SCOTT delivered the opinion of the court:

The plaintiff, Foster Enterprises, Inc., filed this action in the Circuit Court of La Salle County, seeking specific performance and damages for breach of a certain contract it had entered into with the defendant, Germania Federal Savings and Loan Association. A jury returned a verdict for the plaintiff, awarding it specific performance and money damages in the amount of $257,000. In a post-verdict ruling the trial court set aside the award of specific performance but permitted the damage award to stand. Both the plaintiff and defendant have appealed the verdict of the circuit court.

Prior to October 1974, Germania had loaned money to a certain

contractor/developer for the purpose of constructing apartment projects in Batavia, Mount Vernon, Sterling and Peru, Illinois. As a result of the lender's inadequate supervision of periodic payouts, it became necessary to foreclose on the partially completed Peru project, for which Germania received a sheriff's deed in December, 1975. For nearly a year and a half, the financial institution attempted unsuccessfully to sell the unfinished apartments or alternatively to enter into a contract with a builder to finish the project.

These attempts became more urgent as the City of Peru (City) filed condemnation proceedings seeking a court order mandating the repair or demolition of the incomplete buildings. The Peru project included three partially completed buildings containing 52 apartments. One of the three buildings was four inches out of plumb and the other buildings had been vandalized. The real estate described in the sheriff's deed also included over four acres of excess land upon which numerous concrete slab foundations had been constructed.

The idled apartment project commanded Germania's utmost attention when on May 20, 1977, as a result of the City's condemnation action, the La Salle County Circuit Court entered an order directing work to commence on the property within five days or the buildings would be razed at Germania's expense. Prior to May 20, 1977, negotiations had been initiated between Germania and the plaintiff for the sale and/or repair of the Peru project. On May 26, 1977, the negotiations between Foster and Germania culminated in an agreement which was prepared by Germania's president, William Osborne. Osborne hand-carried the agreement from Alton to Bloomington where he met with agents of Foster, and thereafter left for Peru where a local contractor was obtained to move construction equipment onto the project site. The City was notified that construction had begun.

Key portions of the Foster-Germania ageement are excerpted here:

"1. Construction contracts shall be entered into between Germania Federal and various subcontractors subsequent to submission and approval by Germania Federal of such bids on all work necessary to complete the initial 52 units of the project. Said approval shall not be unreasonably withheld by Germania. * * * The cost of completing the project shall be borne by Germania Federal. Insofar as is reasonably possible, Germania Federal shall carry, at its own expense, insurance covering not only fire, wind and other such hazard risks, but also liability insurance naming Foster as an additional insured thereon. Additional liability insurance required by Foster shall be an expense of Germania Federal provided prior showing of need and approval is obtained. Foster will take no responsibility for delays or damages arising from problems with

governmental agencies, labor or union problems, strikes, weather, site conditions, or delays caused by material suppliers; however Foster will pursue the completion of the project with due commercial diligence.

2. Foster will earn an add-on charge of 5% of the total bids from subcontractors on all work necessary to complete the initial 52 units of the project for acting as supervisor of the construction if Foster does not exercise the option to purchase contained herein.

3. Germania Federal shall retain title ownership of the real estate and improvements during the construction phase until the three (3) buildings with a total of fifty-two (52) units are completed and leased to 90% occupancy and shall disburse construction funds after submission of proper contractor's affidavits and lien waivers and inspection and approval of the work completed by an appraiser acceptable to Germania Federal. * * *

4. Interest at the rate of 8¾% on the funds distributed during construction shall be added as it accrues to the total cost of the completed improvements.

5. Germania Federal shall advertise, rent and manage the apartments for eight months from the time the total improvements are completed in a habitable condition or no longer than 60 days following attainment of 90% occupancy, whichever is sooner. All net rental received by Germania Federal shall be applied to the interest charged on funds disbursed during construction. When 90% occupancy is obtained, the sale price from Germania Federal to Foster shall be determined based upon a market value appraisal acceptable to both parties. The sale price will not exceed 80% of said market value appraisal. The agreed upon value of the excess land separated from that required for the initial 52 units is $63,000.00 * * * said amount to be included as a component of the sales price. The second component is construction costs estimated at $460,000. The third component is the amount due Germania Federal for land and improvements in place prior to the date of this agreement, value to be determined by the market upon attaining 90% occupancy. The appraisal shall consider projected rental income from the total project providing for a 5% vacancy factor based on rentals being obtained at the time 90% occupancy is attained and shall also consider costs of debt service at 8¾% interest, all normal and reasonable costs of operation * * * and a fee of 5% of gross rentals to Foster. Depreciation shall not be considered as a cost of operation.

6. Foster shall have sixty (60) days from the time said purchase price is determined to exercise the option to purchase. Germania

Federal shall finance the purchase price at not more than 8¾% interest for a term of twenty (20) years * * *. Foster shall execute a Note and mortgage acceptable to Germania Federal which shall provide generally as follows:

    a. No personal liability.

    b. Waiver of any right of redemption Foster may have pursuant to applicable law.

    c. Release of parcels of the undeveloped land as provided hereinafter.

* * *

8. In the event Foster should decline to purchase the project or in the event Germania Federal and Foster are unable to agree on a sale price within a period of one (1) year from the date of completion of the 52 apartment units, or 60 days following attaining 90% occupancy, whichever is sooner, Foster shall be entitled only to the 5% add-on charge as provided above and all duties and liabilities of the parties to each other pursuant to this agreement shall cease."

There is now a sharp controversy over the application of this agreement to events which occurred subsequent to its execution.

Among the subsequent events which occurred was the completion of the 52 apartment units begun several years earlier. Occupancy in the units reached a 90% rate on January 24, 1978. At that time, an appraisal of the project was undertaken by Roy R. Fisher, Inc., at the request of the defendant herein, Germania. The Fisher corporation had done appraisals for Germania in the past and was retained by Germania because of satisfactory past performance.

Germania received the completed appraisal from Fisher on January 27, 1978. After reviewing the bottom line figure of $925,000, Germania sent a letter to Foster, along with a copy of the appraisal report. Germania's letter rejected the appraisal and stated that the bottom line figure "should be closer to $1,250,000." Had such an appraisal been made and a sales price calculated upon 80% of $1,250,000, Germania would have received slightly more than its book value for the Peru project.

Foster responded that it intended to exercise its option to purchase based on 80% of the Fisher appraisal, which Foster accepted and approved. Germania made a counteroffer to sell for 100% of the Fisher appraised value, a sale price just $1,700 more than Germania's posted book value, but Foster responded that it intended to strictly adhere to the 80% of value provision in the previously executed contract. Thereafter, Germania had the property appraised by its staff appraiser, Paul Pope. The Pope appraisal amounted to $1,200,000. By letter of April 7, 1978, Germania advised Foster that it found the Pope appraisal acceptable. If

the sale had occurred at 80% of the Pope appraisal, Germania would have received approximately $1,000 more than its posted book value of the Peru property. Foster rejected the new appraisal and adhered to its position that its option to purchase was validly exercised based on the Fisher appraisal.

Shortly after the exchange regarding the Pope appraisal, Germania sent Foster a check for $33,752.56, being the contractually determined 5% add-on payable to Foster in the absence of an agreed appraisal price. The next day Foster filed the instant action against Germania.

The cause proceeded to trial with Foster seeking specific performance of the disputed option to purchase based upon the price established by the Fisher appraisal. In the alternative, Foster sought damages for breach of contract. This pleading for relief in the alternative was opposed by Germania in a motion at the close of all the proofs. Therein, the defendant sought to have the court order Foster to elect as its remedy either specific performance or money damages. The court denied Germania's motion to elect remedies but took under advisement that party's motion to direct a verdict against Foster denying the equitable relief prayed for. The case went to the jury with instructions as to the legal issues and with a verdict form that sought an advisory decision regarding the request for specific performance.

Among the instructions with which the jury was charged were the following:

"A fact may be proved by circumstantial evidence. Circumstantial evidence consists of proof of facts or circumstances which give rise to a reasonable inference of the truth of the fact sought to be proved.

\* \* \*

Every contract necessarily includes an implied covenant that the contractual duties of the parties will be performed in good faith, and that each will deal fairly with the other in the performance of the contract.

\* \* \*

In order for the plaintiff to recover, it has the burden of proving the following propositions:

One, that the plaintiff complied with the terms and conditions in the contract pertaining to the option to purchase the real estate that is the subject matter of that contract;

Two, that the defendant breached its implied covenant in the contract to deal in good faith and fairness with the plaintiff in refusing to accept the Roy R. Fisher, Inc. appraisal and in refusing to accept plaintiff's offer to purchase based upon that appraisal, or, wilfully refused to accept the appraisal of Roy R. Fisher, Inc. in

order to avoid selling the property to the plaintiff under the terms and conditions of the May 27, 1977, contract.

Three, that the plaintiff was damaged.

If you find from your consideration of all the evidence that the foregoing propositions "One", and "Three", and either theories of proposition "Two" have been proved, then your verdict should be for the plaintiff.

\* \* \*

If you find for the plaintiff and against the defendant, you must assess plaintiff's damages. Because the plaintiff has asked the Court to order that the property be conveyed to it, you must advise the Court as to your opinion whether the Court should decree specific performance and convey the property. Your recommendation may or may not be accepted by the Court, and therefore, you should assess the total amount of damages sustained by the plaintiff."

The jury returned a verdict for Foster in the amount of $257,000 finding that Germania had breached its implied promise to deal in good faith and fairness with Foster. The jury advised the chancellor to award specific performance. The court declined to do so and instead directed a verdict for the defendant on the motion under advisement denying the prayer for relief in equity. Germania has appealed the jury's award of legal relief, and Foster has cross-appealed the trial judge's denial of equitable relief.

We affirm subject to remittitur.

The contract between Germania and Foster is essentially a contract for construction management services. Specifically, Foster agreed to provide construction management services and in consideration therefor, it was to receive a "5% add-on charge" or it was to receive an option to buy the subject real estate at "80% of [the] market value appraisal." Such an appraisal was required to be "acceptable to both parties." The thrust of Germania's argument, both in the court below and here on appeal, is that there never was an appraisal acceptable to both parties and hence the plaintiff's recovery on the contract must be limited to the 5% add-on charge. Foster urges that it cannot be denied the benefit of its bargain in such an arbitrary manner.

■■ There can not be any doubt that a covenant of fair dealing and good faith is implied into every contract absent express disavowal. This rule has been codified in the law of sales and negotiable instruments (Ill. Rev. Stat. 1979, ch. 26, par. 1—203), and is a part of our common law heritage. (*Spircoff v. Spircoff* (1979), 74 Ill. App. 3d 119, 392 N.E.2d 363; *Criscione v. Sears, Roebuck & Co.* (1978), 66 Ill. App. 3d 664, 384 N.E.2d 91; *Stevenson v. ITT Harper, Inc.* (1977), 51 Ill. App. 3d 568, 366 N.E.2d 561; *Pierce v. MacNeal Memorial Hospital Association* (1977), 46 Ill. App. 3d

42, 360 N.E.2d 551; *Snyder v. Howard Johnson Motor Lodges* (S.D. Ill. 1972), 412 F. Supp. 724; *Dasenbrock v. Interstate Restaurant Corp.* (1972), 7 Ill. App. 3d 295, 287 N.E.2d 151; *Martindell v. Lake Shore National Bank* (1958), 15 Ill. 2d 272, 154 N.E.2d 683.) It is unrefuted that Germania never accepted the Fisher appraisal. What is disputed is whether such refusal could ever be so unreasonable, arbitrary and capricious as to constitute actionable bad faith, and if so, whether the weight of the evidence supported the jury's conclusion in this particular case.

In a case decided last year, the appellate court recognized that every contract contains an implied promise of good faith and fair dealing between the contracting parties. (*Spircoff v. Spircoff.*) In that factual setting, the implied promise imposed a condition of cooperation on the parties. Where that cooperation was not forthcoming, the promise was breached and an award of damages was sustained. *Spircoff v. Spircoff.*

In *Pierce v. MacNeal Memorial Hospital Association,* one of the defendants thwarted the occurrence of a condition precedent and thus sought to deny the benefits of the bargain to the plaintiffs. Citing the implied promise in the contract between the parties, the court determined that rudimentary principles of good faith rendered such a legal posture untenable.

The appellate court in *Dasenbrock v. Interstate Restaurant Corp.* considered the implied promise of good faith and fair dealing in the context of a landlord-tenant dispute. In the governing lease agreement, the tenant's obligation to pay rent arose when it secured the necessary licenses, consents, and permits. The *Dasenbrock* court held that in such circumstances, where the tenant's indolence could deny the landlord the benefit of its bargain, the tenant was obliged to use reasonable efforts to secure its license within a reasonable time.

■■ The same promise of good faith is recognized by courts of other jurisdictions. For example, a North Carolina court determined that the promise of good faith was an implied term of a contract to purchase real estate. (*Mezzanotte v. Freeland* (1973), 20 N.C. App. 11, 200 S.E.2d 410, *cert. denied* (1974), 284 N.C. 616, 201 S.E.2d 689.) In the *Mezzanotte* case, the purchase agreement was contingent on the securing of financing on such terms and conditions as were satisfactory to the purchasers. In discussing this contingency, the court held:

> "The contract implies that [the purchasers] would in good faith seek proper financing from [the bank] and that such financing in keeping with reasonable business standards could not be rejected at the personal whim of [the purchasers] but only for a satisfactory cause. Where a contract confers on one party a discretionary power affecting the rights of the other, this discretion must be exercised in a reasonable manner based upon good faith and fair

play. * * * A promise conditioned upon an event within the promisor's control is not illusory if the promisor also 'impliedly promises to make reasonable effort to bring the event about or to use good faith and honest judgment in determining whether or not it has in fact occurred.' [Citation.] The implied promise is enforceable by the promisee, and it constitutes a legal detriment to the promisor; therefore it furnishes sufficient consideration to support a return promise." (20 N.C. App. 11, 17, 200 S.E.2d 410, 414-15.)

We believe certain facts of the instant case are analogous to the facts in *Mezzanotte*. In both cases the contract confers on one party a discretionary power affecting the rights of the other. In *Mezzanotte*, that was the discretion to determine what terms and conditions of financing were satisfactory. In the case *sub judice*, that was the discretion to determine whether the market value appraisal was acceptable. Just as the implied promise of good faith required the *Dasenbrock* tenant to use reasonable efforts to obtain a license and required the *Mezzanotte* purchaser to accept financing in keeping with reasonable business standards, we believe the defendant here, Germania, had impliedly promised to accept a reasonable market value appraisal. That is, Germania promised not to reject an appraisal because of corporate whim but only for satisfactory cause.

Good faith between contracting parties requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously. (*Pacific Far East Line, Inc. v. United States* (U.S. Ct. Cl. 1968), 394 F.2d 990; *Accord, MacDougald Construction Co. v. State Highway Department* (1972), 125 Ga. App. 591, 188 S.E.2d 405; *California Lettuce Growers, Inc. v. Union Sugar Co.* (1955), 45 Cal. 2d 474, 289 P.2d 785; *Boone v. Kerr-McGee Oil Industries, Inc.* (10th Cir. 1954), 217 F.2d 63.) Where contractual discretion is exercised in bad faith, the contract is breached and it is incumbent on the courts to grant appropriate relief; however, bad faith is not synonymous with erroneous judgment. There can be no relief from an erroneous judgment exercised in good faith pursuant to a valid discretionary power. (*Pacific Far East Line, Inc. v. United States.*) We hold that Germania impliedly promised to accept a reasonable market value appraisal. We hold that a failure to do so results in an actionable breach of contract. And, we hold that the jury heard sufficient circumstantial evidence to conclude that Germania's refusal to accept the appraisal was in bad faith. The evidence tended to prove that Germania rejected the Fisher appraisal not because it failed to fairly and accurately estimate the market value of the Peru project, but instead because it resulted in a sale price that was too low to permit the lending institution to bail out of a mortgage loan long since gone sour. Although the jury was not obliged to accept this

circumstantial evidence of bad motive, its decision to do so is amply supported by the record before us. 2 Ill. L. & Prac. *Appeal and Error* §774 (1953).

Defendant Germania urges us to find that the contract between the parties should be construed by the court as a matter of law, and that in so construing the *express* terms of the contract this court should determine that no offer and acceptance of the option to purchase occurred. We deem it unnecessary to consider these arguments of Germania because such arguments overlook the *implied* terms of the subject contract. Although contract terms implied in law cannot supplant express contract terms (*Snyder v. Howard Johnson Motor Lodges*), implied terms can supplement express terms. The breach alleged in several counts of Foster's complaint specifically cites the "implied covenant of honesty and fair dealing." A review of the charge to the jury reveals that alleged bad faith is the only breach they considered. As there is no express contract term which negates the promise of good faith, we believe the plaintiff correctly focuses our review on the agreement's implied rather than express terms.

The advantageous purchase option set forth in the agreement is not a naked offer subject to withdrawal at any time, but rather is consideration for construction management services and must be extended for 60 days after a sale price is established. While it is true that the option price remains indefinite unless an appraisal is accepted, acceptance must not be unreasonably withheld. *Mezzanotte v. Freeland*.

Defendant Germania also urges us to accept the veracity of evidence in the record which established that satisfactory cause existed for Germania's rejection of the Fisher appraisal. It is hornbook law that such factual determinations are exclusively the province of the jury. (2 Ill. L. & Prac. *Appeal and Error* §776 (1953).) Under the facts in this record, the jury could disbelieve the evidence of the appraisal's defects or the jury could believe the evidence but determine the defects inconsequential. In either case, the record on appeal would support the verdict reached below.

■■ The maximum sale price pursuant to the Fisher appraisal, which price Foster offered to pay, was $740,000. The bottom line of the Fisher appraisal was $925,000. The difference is $185,000. At the trial in the circuit court, Foster presented a second appraisal, the Crowley appraisal, conducted nearly 1½ years after the acceptance by Foster of the disputed Fisher appraisal. The bottom line of this second appraisal was $997,000. The difference between 80% of the Fisher appraisal and the 100% of the Crowley appraisal is $257,000, or the amount of the jury's verdict. Germania exhorts us to agree that if any damages were proper, then the correct amount of damages is $185,000, not $257,000. We think that is

correct. The general measure of damages for a contract breach as found by the La Salle County jury gives the injured party the loss of its bargain, plus consequential damages in the contemplation of the parties. This loss of bargain is the difference between the contract price and the market value of the land *on the date of breach*. (D. Dobbs, Handbook of the Law of Remedies §12.7 (1973).) Any breach of the promise of good faith and fair dealing occurred in the spring of 1978 when the Fisher appraisal was rejected. The date of breach is clearly not November 1979, when the Crowley appraisal established market value. The court below should have granted Germania's motion for remittitur reducing damages from $257,000 to $185,000, as no consequential damages were alleged or proved. We order the appropriate remittitur pursuant to supreme court authority. Ill. Rev. Stat. 1979, ch. 110A, par. 366(a)(5).

Finally, we come to the issues involving the equity side of this case and plaintiff's cross-appeal. Germania argues that the circuit court erred in allowing the plaintiff to simultaneously pursue the remedies of specific performance and money damages. Further, the lender contends that it was error to submit the advisory verdict form to the jury without any instruction regarding an award of specific performance. Foster counters with the contention that the trial judge erred in not following the recommendation of the advisory verdict.

■■ The authorities upon which Germania places primary reliance were all handed down prior to January 1, 1934. (*Sluka v. Bielicki* (1929), 335 Ill. 202, 167 N.E. 90; *Bell v. Anderson* (1920), 292 Ill. 605, 127 N.E. 87; *Herrington v. Hubbard* (1839), 2 Ill. 569.) We believe the continuing validity of those cases is subject to some doubt in light of the passage of the Civil Practice Act, which took effect on January 1, 1934. (1933 Ill. Laws 784.) The Civil Practice Act permitted a new concept in the act of pleading, *viz*, relief in the alternative. (Ill. Rev. Stat. 1933, ch. 110, par. 158.) The modern view of election of remedies is set forth in *Elmore Real Estate Improvement Co. v. Olson* (1947), 332 Ill. App. 475, 76 N.E.2d 204, 207. There the case of *Fleming v. Dillon* (1938), 370 Ill. 325, 331, 18 N.E.2d 910, was quoted approvingly:

> "If coexistent remedies are consistent with each other, a party may adopt all or select any one which he thinks best suited to the end sought, and only the satisfaction of the claim in one case constitutes a bar of the other."

The *Elmore* court determined that the remedies of money damages and specific performance were not inconsistent remedies. As the plaintiff has not sought to enforce its judgment for money damages, it may pursue the alternative, consistent remedies on appeal. D. Dobbs, Law of Remedies §1.5 (1973).

■■ We find no error in the failure to submit instructions to the jury on the

equitable issues in the case. The jury's verdict in equity is advisory only, and the court's instruction made clear that only the jury's determination with regard to money damages would be binding and final.

■■ The decisions below by the jury at law and by the circuit judge in equity are not of necessity inconsistent. An entire panoply of defenses is available in equity that is not available at law; a greater degree of certainty is required as a basis for the equitable remedy of specific performance than is necessary to warrant recovery of damages at law. (33A Ill. L. & Prac. *Specific Performance* §32 (1970).) In the case at bar, with the option price undefined in the contract between the parties, the chancellor may well have concluded that the requisite certainty for specific performance was lacking. In reviewing the denial of specific performance, the decision reached in the trial court will not be disturbed unless it exhibits an abuse of discretion. (*Mohnk v. Seyfarth* (1930), 339 Ill. 371, 171 N.E. 510; *Chicago Title & Trust Co. v. Schwartz* (1930), 339 Ill. 184, 171 N.E. 169; *Carver v. Van Arsdale* (1924), 312 Ill. 220, 143 N.E. 579.) For reason of the uncertainty of the option price in the subject contract, we hold no abuse of discretion occurred when the extraordinary remedy of specific performance was denied.

Although errors in the pleadings are alleged, those errors have been waived as they were not raised and preserved in the proceeding below.

For the reasons set forth, we affirm the decision reached below subject to remittitur. The remittitur should be in the amount of $72,000, and if the plaintiff-appellee will file a remittitur in this amount in this court on or before 30 days from the date of the receipt by counsel for plaintiff-appellee of a certified copy of this opinion, judgment will be entered in the case in the sum of $185,000; otherwise, said cause is remanded to the Circuit Court of La Salle County for a new trial.

Affirmed upon remittitur—otherwise reversed and remanded.

BARRY, J., concurs.

Mr. JUSTICE HEIPLE, dissenting:

The majority holds that Germania Federal Savings and Loan Association breached the agreement of the parties by not accepting the amount of the first market value appraisal made on the property in question. With this result I must dissent.

Germania Federal Savings and Loan Association and Foster Enterprises, Inc., entered into an agreement on May 26, 1977, providing for Foster to complete construction of certain apartments on property owned by Germania. The parties further agreed that when the building project was completed and 90% occupancy obtained, Foster would have the

option to purchase the property subject to future negotiation on the purchase price. Foster would have 60 days from the time that such purchase price was agreed upon by the parties to exercise its option. Specifically, the agreement terms provided that:

"5. When 90% occupancy is obtained, the sale price from Germania Federal to Foster shall be determined based upon a market value appraisal acceptable to both parties. The sale price will not exceed 80% of said market value appraisal. The agreed upon value of the excess land separated from that required for the initial 52 units is $63,000.00, said amount to be included as a component of the sale price."

"8. In the event Foster should decline to purchase the project or in the event Germania Federal and Foster are unable to agree on a sale price within a period of one (1) year from the date of completion of the 52 apartment units, or 60 days following attaining 90% occupancy, whichever is sooner, Foster shall be entitled only to the 5% add-on charge as provided above and all duties and liabilities of the parties to each other pursuant to this agreement shall cease."

Thus it is evident that Foster had an option to purchase the property subject to several events happening: (1) the building project be completed; (2) 90% occupancy of the apartments; (3) Germania and Foster agree upon a market value appraisal which is acceptable to both of them. When all those events occurred only then did Foster have an option to purchase the property at 80% of the mutually agreed upon market value appraisal.

Did these events occur?

The record reveals that the building project was substantially completed in January of 1978. On January 24, 1978, the 90% occupancy was obtained, and Germania engaged Roy R. Fisher, Inc., to appraise the property. A market value figure of $925,000 was submitted by Fisher for the 2 acres of improved apartment property and the 4.2 acres of excess adjacent land. Germania reviewed that appraisal and found it unacceptable. Germania sent to Foster a copy of the complete Fisher appraisal report stating that the figure was not acceptable to them and they had not yet arrived at a sale price. Germania indicated that the Fisher report was forwarded merely for study and suggestion.

On March 6, 1978, Foster notified Germania that it was exercising its option to purchase based on the $925,000 Fisher appraisal figure. As the agreement provided that the sale price would be 80% of the agreed upon market value appraisal, Foster considered the sale price to be 80% of $925,000 or $740,000.

One week later Germania responded with an offer of $825,000 for the 2 acres of improved apartment property.

Rejecting this offer, Foster adamantly adhered to the notion that it was exercising the option at 80% of the Fisher appraisal for the entire property. Foster maintained that it was merely complying "strictly to the contract signed by the parties which spelled out the sales price of the entire property at 80% of the appraisal of [Germania's] appraiser."

The signed contract did not state that. The agreement did not state that the sales price would be 80% of the appraisal figure submitted by Germania's appraiser. Nowhere in the agreement was a procedure outlined for appraisal of the property. The agreement did not provide that a party forwarding an appraisal for "study and suggestion" to the other party thereby became bound by that appraisal figure. Nor is it reasonable to imply that interpretation from such action. Moreover, Germania unequivocally stated that the Fisher appraisal was unacceptable to them.

In a commercial transaction of this magnitude, it is not unreasonable to assume that several appraisals would be solicited by both parties. I see no reason to conclude that a party is acting in bad faith merely because it does not adopt the first appraisal on real estate worth close to a million dollars.

I think it is clear from the facts that the parties did not agree upon a market value appraisal acceptable to both of them. Thus, no option contract was formed for Foster to exercise.

The parties considered the possibility that they would be unable to agree upon a sales price and provided accordingly in the contract. The parties agreed that if they were unable to agree upon a sales price, "that Foster shall be entitled to the 5% add-on charge."

For these reasons, I believe that the judgment of the La Salle County Circuit Court should be reversed.

Judgment properly should be entered for Foster in the amount of $33,752.56, the 5% add-on charge.