**GREER PROPERTIES, INC., a Delaware corporation, Plaintiff–Appellant,**

v.

**LaSALLE NATIONAL BANK, a national banking corporation acting as trustee u/t/a No. 107486 and Old Orchard West Venture, an Illinois General Partnership, Defendants–Appellees.**

No. 88–2188.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 17, 1989.

Decided May 5, 1989.

Rehearings Denied June 15, 1989.

Robert J. Trizna, Trizna & Lepri, Chicago, Ill., for plaintiff-appellant.

Louis R. Hegeman, and Jay D. Stein, Gould & Ratner, Chicago, Ill., for defendants-appellees.

Before WOOD, Jr., POSNER, and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This is a contracts case arising from efforts to develop a piece of commercial real estate located near the Edens Expressway in Skokie, Illinois. Four local developers formed a partnership called Old Orchard West Venture ("Old Orchard") and acquired the real estate parcel in 1984. Legal title to the real estate is held in the name of LaSalle National Bank ("LaSalle"), as trustee. In 1987, Old Orchard and LaSalle ("Sellers") entered into a contract to sell the property to plaintiff-appellant Greer Properties, Inc. ("Greer"), a wholly-owned subsidiary of the Marriott Corporation.[1] The Sellers terminated the contract prior to the closing and Greer brought this action in federal district court, claiming the termination was improper. The district court entered summary judgment for the defendants and Greer appeals.

Plaintfff-appellant Greer is a Delaware corporation. Defendant-appellee Old Orchard is an Illinois partnership and defendant-appellee LaSalle is a national bank with its principal place of business in Illi-

---

1. The contract at issue in this case was negotiated by Marriott personnel, but it was actually signed on behalf of Greer.

nois. The case involves a contract to purchase real estate for $1,250,000. The district court had jurisdiction under 28 U.S.C. § 1332. We review this case under 28 U.S.C. § 1291.

## I. FACTUAL BACKGROUND

William Hoag, Albert Scherb, Jr., Kyle Ahrberg, and Michael Klonoski are the four developers who formed Old Orchard. The affairs of the partnership were managed primarily by William Hoag. Old Orchard purchased the property in January, 1984 for $700,721.70, intending to develop the parcel by constructing, leasing, and managing a building on it. In 1986, unable to fulfill its development plan, Old Orchard commenced efforts to sell the property outright or to construct a building on it for a predetermined tenant. Two buyers expressed serious interest in the property: G.D. Searle Co. ("Searle"), which maintained its corporate headquarters on the adjoining real estate, and Marriott Corporation, which wanted to construct a motel on the property.

The Sellers agreed to sell the property to Searle and entered into a contract on February 16, 1987. Searle promised to pay approximately $1,100,000. The contract between Searle and the Sellers allowed Searle to terminate the agreement if the soil of the property was contaminated by environmental waste. Searle hired an environmental consulting firm to study the condition of the property. The firm reported that cleaning up the contamination would cost in excess of $500,000. Because of the extensive contamination, Searle requested that the Sellers reduce the contract price. The Sellers refused and Searle exercised its right to terminate the contract.

The Sellers then began negotiating with Marriott Corporation through its real estate subsidiary, Greer. The parties entered into a contract on July 31, 1987. The Sellers agreed to sell the property to Greer for $1,250,000. As part of the contract, the Sellers were required to remove the environmental contamination at their own expense. The Sellers were also allowed to terminate the contract if the cost of the clean-up became "economically impracticable." The pertinent section of the contract states:

> Seller is currently having a study conducted to determine the existing soil condition ("Soils Study").... Seller further agrees to take all action recommended by the Soils Study and the Illinois Environmental Protection Agency to bring the soil into compliance with all local, state and federal ordinances, laws or regulations and shall use its best efforts to have all such work completed prior to Closing; provided, however, that if the cost of such clean-up work will, in Seller's best business judgment, be economically impracticable, then Seller, at its option, may terminate this Contract....

Greer had been advised that Searle had found contaminants on the property, but Greer was not told of the cost estimates contained in the Searle report. In September 1987, after the contract had been signed, Hoag informed Greer of his own cost estimates for the clean-up—between $60,000 and $100,000. Hoag testified that he did not believe the estimate made in the Searle study; he felt the high estimate of the clean-up cost was a negotiating tactic used by Searle to get the Sellers to lower their price.

The Sellers retained a soil consultant to study the nature and extent of the contamination. In mid-September, the consultant estimated the cost of the clean-up at between $100,000 and $200,000. The parties disagree about whether the Sellers informed Greer at that time of their conclusion that the contract had been rendered economically impracticable by the escalating cost of the clean-up. Without formally notifying Greer that they intended to terminate the contract, the Sellers entered into a new round of negotiations with Searle following the receipt of the consultant's report and a purchase price of $1,455,000 was proposed. A draft contract containing this price was sent by Searle to the Sellers on October 7, 1987. On that same date, Sellers received a final report from their soil consultant, estimating the clean-up costs at between $190,000 and $240,000. On Octo-

ber 8, 1987, the Sellers formally terminated the contract with Greer by sending the required written notice. After the termination, the Sellers indicated to Greer that Greer could still buy the property if it increased the purchase price by $250,000. Greer never made the higher offer. After terminating the contract, the Sellers cleaned up the property at a cost of $251,825.

On December 31, 1987, Greer filed a complaint in the United States District Court for the Northern District of Illinois, Eastern Division, seeking specific performance of the contract and money damages. The Sellers answered the complaint and filed a counterclaim seeking a declaratory judgment that their termination of the contract was proper. The Sellers also filed a motion for summary judgment on their counterclaim. The district court granted the Sellers' motion for summary judgment, concluding that no genuine issue of material fact existed and that Sellers were entitled to judgment as a matter of law. The district court found that, under Illinois law, the language of the contract gave the Sellers broad discretion to terminate upon receipt of the soil consultant's study. The court rejected Greer's contention that the Sellers terminated the contract in bad faith so they could sell the property to Searle, finding that the Sellers had decided to end their contract with Greer before reopening negotiations with Searle. Greer appeals this entry of summary judgment, arguing that the district court erred in finding that the clean-up cost made performance economically impracticable. Greer also states that genuine issues of material fact exist as to whether the Sellers were acting in bad faith when they terminated the contract.

## II. DISCUSSION

Summary judgment was entered by the district court in favor of the Sellers. Summary judgment shall be entered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56(c). *See Matthiessen v. North Chicago Community High School Dist.*, 857 F.2d 404, 406 (7th Cir.1988). We review *de novo* the district court's entry of summary judgment. *Colan v. Cutler–Hammer, Inc.*, 812 F.2d 357, 360 (7th Cir.) (per curiam), *cert. denied*, ── U.S. ──, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). The possibility that a factual dispute may exist is not enough by itself to justify reversing an entry of summary judgment. *Posey v. Skyline Corp.*, 702 F.2d 102, 106 (7th Cir.), *cert. denied*, 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). If there are doubts as to the existence of a material fact, these doubts should be resolved in favor of the nonmoving party and the grant of summary judgment should be reversed. *DeValk Lincoln Mercury, Inc. v. Ford Motor Corp.*, 811 F.2d 326, 329 (7th Cir.1987). *See also Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512 (standard to be applied similar to directed verdict standard; does evidence present disagreement sufficient to require submission to jury or must one party prevail as matter of law).

Applying this standard to the district court's decision, we address Greer's first contention. Greer argues that the district court erred by finding that the contract's termination provision gave the Sellers broad discretion in determining whether the cost of the clean-up made the sale economically impracticable. The district court found that the Sellers effectively exercised their option to terminate the contract, noting that the use of the term "best business judgment" gave the Sellers much discretion in determining economic impracticability.

Greer argues that the clean-up costs did not make the contract economically impracticable and claims that the discretion given to the Sellers by the contract did not cover the situation in existence at the time of

termination. Greer notes the lack of case law defining the term "economic impracticability" and contends that "economically impracticable" means "commercially impracticable." That term has been defined repeatedly by courts as allowing a party to terminate when performance has been made virtually impossible by circumstances that a party could not have reasonably foreseen at the time of formation. *See, e.g., Transatlantic Financing Corp. v. United States,* 363 F.2d 312, 319–20 (D.C. Cir.1966) (closing of Suez Canal by war caused rerouting of ship; increased cost alone did not make performance impossible). Greer argues that this definition should be applied in this case, leading to a conclusion that the Sellers incorrectly terminated the contract since a mere increase in cost does not excuse performance. *See Neal–Cooper Grain Co. v. Texas Gulf Sulphur Co.,* 508 F.2d 283, 293 (7th Cir.1974) ("The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused."). *See also United States v. Wegematic Corp.,* 360 F.2d 674, 676–77 (2d Cir. 1966).

■ The trial court was correct in rejecting this attempt to equate "economic impracticability" with "commercial impracticability." The doctrine of commercial impracticability is designed to deal with unforeseen circumstances that render performance nearly impossible. *See Waldinger Corp. v. CRS Group Engineers, Inc.,* 775 F.2d 781, 786 (7th Cir.1985) (circumstances causing breach are vitally different from those anticipated in contract). Here, the parties did contemplate the cost of the environmental clean up when the contract was drafted—there were extensive negotiations on the subject. The Sellers were given the express option to terminate the contract if the clean-up costs proved excessive. As the district court noted, the "situation giving rise to termination was a foreseen possibility that was expressly addressed" in the contract. *Greer Properties, Inc. v. LaSalle Nat'l Bank,* 689 F.Supp. 831, 834 (N.D.Ill.1988). The doctrine of commercial impracticability does not apply in this case.

More importantly, the use of the phrase "best business judgment" is critical to understanding the discretion given to the Sellers by this contract. "Best business judgment" reserved to the Sellers the ultimate determination of whether the cost increase was large enough to warrant cancellation. "Economic impracticability" must be read together with "best business judgment" to understand the breadth of discretion given to the Sellers. The district court's analysis of the termination clauses was correct; the Sellers were vested with broad discretion to terminate the contract.

Nonetheless, Greer argues that, even if the Sellers had that broad discretion, they acted in bad faith in terminating the contract as they did. Greer claims that the Sellers terminated the contract to get a better price from Searle. The district court found that the Sellers acted in good faith, discounting the fact that Searle made an offer to the Sellers one day before the Sellers notified Greer of the termination. The district court determined that the Sellers had decided to end the contract with Greer long before they opened negotiations with Searle, and the court placed great weight on the Sellers offer to convey the property to Greer if Greer would add $250,-000 to the purchase price.

Under Illinois law, "every contract implies good faith and fair dealing between the parties to it." *Martindell v. Lake Shore Nat'l Bank,* 15 Ill.2d 272, 286, 154 N.E.2d 683, 690 (1958); *see also Spircoff v. Spircoff,* 74 Ill.App.3d 119, 127–28, 29 Ill. Dec. 806, 812, 392 N.E.2d 363, 369 (1979); *Rao v. Rao,* 718 F.2d 219, 222 (7th Cir. 1983). This implied obligation of good faith and fair dealing in the performance of contracts acts as a limit on the discretion possessed by the parties. In Illinois, "a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously." *Foster Enterprises, Inc. v. Germania Fed. Savings and Loan Ass'n,* 97 Ill.App.3d 22, 30, 52 Ill.Dec. 303, 309, 421 N.E.2d 1375, 1381 (1981). *See generally* Burton, *Breach of Contract and the Common Law Duty To Perform in Good Faith,* 94 Harv.L.

Rev. 369 (1980); *see also* Anderson, *Good Faith in the Enforcement of Contracts,* 73 Iowa L.Rev. 299 (1988). If discretion is exercised in bad faith, a breach of contract occurs and the court must grant relief to the aggrieved party. *Foster Enterprises,* 97 Ill.App.3d at 30, 52 Ill.Dec. at 309, 421 N.E.2d at 1381.

With this limitation on the discretion of the Sellers in mind, their decision to terminate the contract must be analyzed to determine if they acted in good faith. If the Sellers terminated the contract to obtain a better price from Searle, their action would have been in bad faith. When the Sellers entered the contract with Greer and Greer agreed to pay them a specific price for the property, the Sellers gave up their opportunity to shop around for a better price. By using the termination clause to recapture that opportunity, the Sellers would have acted in bad faith.

The district court's determination that, as a matter of law, the Sellers terminated the contract in good faith was not correct. There are questions of material fact that remain. As we have noted, in a summary judgment situation doubts should be resolved in favor of the nonmoving party. *DeValk Lincoln Mercury,* 811 F.2d at 329. The timing of the negotiations with Searle raises many questions. Although the district court insisted that the Sellers did not contact Searle until after they had decided unequivocally to cancel the deal with Greer, the evidence on this point is far from clear, and the only uncontroverted point is that the actual notice of termination was not sent to Greer until October 8, 1987, the day after Searle made an offer to buy the property for $1,455,000. There is a question of whether the estimate of the clean-up costs was foreseeable by the Sellers when they entered the contract with Greer, since during the earlier negotiations with Searle, Searle's consultants had estimated the clean-up would cost more than $500,000.

The circumstances of this termination raise many questions of fact concerning the motive behind the termination. These questions go directly to the issue of whether the Sellers breached their duty of good faith and fair dealing by terminating the contract. The conflicting testimony found in the depositions does not eliminate all questions of material fact in relation to this issue. The district court's entry of summary judgment on the issue of whether the Sellers terminated the contract in good faith must be reversed.

## III.  CONCLUSION

The district court correctly interpreted the termination provisions of this contract. The Sellers were empowered with broad discretion to terminate under their best business judgment. However, this discretion was tempered by the implied duty to act in good faith. The district court's entry of summary judgment on the issue of good faith is REVERSED and this case is REMANDED for further proceedings in light of this opinion. Circuit Rule 36 shall not apply.